[Civ. No. 76. Fourth Appellate District.—November 10, 1930.]

T. J. WOLFE, Appellant, v. CLAYTON SEVERNS, Respondent.

Nelson & Burns for Appellant.

Chandler, Wright & Ward and H. C. Mabry for Respondent.

WARNER, J., *pro tem.*—This action arose out of the pretended sale of certain oil-well equipment, consisting of a derrick, tanks, tools, etc. James, Price and Richards owned certain oil leases and oil-well equipment at Huntington Beach, Orange County, California. They were in financial difficulties and made an assignment of their interest in said leases and said equipment to a certain creditors' committee consisting of Spraul, Fairchild and Gale. Said creditors' committee had certain negotiations with Clarence R. Bailey, Pearl R. Bailey, his wife, W. J. White, and Mamie B. White, his wife, looking to the sale of said property. In said negotiations it was agreed to sell said property to Bailey and White for an agreed consideration, payable at specified times; that they were to place all necessary papers in escrow and the delivery thereof was to be made according to the escrow instructions. The deal was never completed because of the failure of Bailey and White to carry out the terms of their agreement. Bailey and White were never in possession of the property, although they did a little work thereon by special arrangement with Spraul, one of the creditors' committee. The appellant, as judgment creditor of Bailey and White, caused an execution to be levied on certain of the personal property in said lease, said personal property being the same property that is the subject of the controversy here. At the sheriff's sale on said execution the said Spraul announced publicly that the creditors' committee claimed the property being offered for sale under said execution. The appellant and his attorney and others were present. Appellant's attorney heard the claim made by Spraul, but appellant does not remember hearing any such claim. Appellant's attorney advised him that all he would get as a result of said sale was the right, title and interest of the judgment debtors. The appellant was the purchaser of said property at said execution sale.

Appellant requested one Dockins to inform him if he found anyone desiring to purchase oil-well equipment, stating that he had two complete outfits, derricks and all, from the crown block down, referring to the property that he

had purchased at the said execution sale. Dockins brought respondent to see appellant concerning said property. After the introduction of said appellant and respondent they went to inspect the property and after some negotiations regarding the particular property to be included in the deal and the prices thereof, they agreed on a deal and at the suggestion of Wolfe went to the office of appellant's attorney to have a bill of sale made and executed.

While they were inspecting the property before going to the office of appellant's attorney, certain representations were made, appellant representing to respondent that he was the owner of said property and there was no claim against the same that he knew of except city taxes, which, in his opinion, would not exceed $50. They went to the office of appellant's attorney and said attorney prepared an instrument and handed the same to the respondent, who objected to the description of the property therein and then said attorney suggested that he make an assignment of the sheriff's certificate of sale, which theretofore had been handed to the respondent for perusal, or a bill of sale on the back of the sheriff's certificate of sale. An assignment of said certificate was placed on the back thereof, executed and delivered to the respondent herein. Whereupon the respondent asked if it was good, and being informed that it was, delivered a check for $1,000, the purchase price of said property, to the appellant. They immediately went to the sheriff's office and inquired if appellant had a right to sell the certificate of sale and were informed by a deputy sheriff that the appellant had such right. Respondent then ordered his employees to dismantle the derrick preparatory to moving the same, but shortly after they began to do so they were notified by some other parties that they were the owners of said property, which fact said employees reported to the respondent. Respondent then made further inquiry of the sheriff's office and learned for the first time that the only interest that he received in the property was the interest of the judgment debtors, which, if any, was questionable. Whereupon respondent immediately returned the certificate of sale, together with the assignment thereon, which had been delivered to him, and demanded the return of his check. The check was delivered to the appellant herein on the twelfth day of February, 1929, and the

return thereof was demanded by the respondent on the fourteenth day of February of the same year. Appellant refused to return the same and brought this action to compel the payment thereof. Respondent's answer sets up, among other things, fraud and failure of consideration.

Respondent asks affirmance of the judgment for failure of the appellant to set up sufficient evidence to comply with the rules of this court. While the testimony set out by the appellant is rather meager, yet we are of the opinion that it is sufficient to require a denial of the motion for affirmance. The motion is, therefore, denied.

It is admitted by the appellant that if there is any substantial evidence to support the findings of the trial court the findings cannot be disturbed on appeal. However, appellant insists that the evidence is insufficient to support the findings. The theory upon which appellant's contention is based is that appellant acquainted respondent with the source of his title by showing him the sheriff's certificate of sale, and insists that in so doing respondent was placed within that class of persons whose duty it is to investigate before purchasing, and having failed to do so, he is precluded from the defense of fraud, and that he got all he bargained for; hence no failure of consideration.

Appellant cites *Brimmer* v. *Salisbury*, 167 Cal. 522 [140 Pac. 30]. That case is one where the court is passing upon the obligation of one who has entered into an executory contract of sale, and the court says at page 527: " 'The conveyance by the vendor was not a breach of the contract. One may sell land which he does not own, and yet be able, when the time of performance arrives, to furnish a good title. In the meantime the purchaser would not be at liberty to disaffirm the contract on the ground that *then* the vendor was unable to make a good title. It would be incumbent upon him to offer to perform, or to show that at the time of performance the vendor could not furnish the title.' Here it is immediately to be noted that a vendor under an executory contract of sale who has title may part with it under two essentially different conditions. He may part with it to a third person, who if he be not charged with knowledge of the previous executory contract, takes it freed from the obligations of that contract. Such would be the case were the executory contract of sale unrecorded.

He may, however, part with his title, subject to the right of the vendees under the executory contract of sale, and thus not put it beyond his reasonable power to make title to his vendees under the executory contract of sale when in due time title may be demanded of him. In the one case the conduct of the vendor may with propriety be termed a fraud upon the vendee, since he has parted with the title, and consequently with the security upon which his vendee was entitled to rely in the making of his installment payments, and after having done so he insists that these installment payments should be continued without any legal assurance to him that at the time when he is entitled to demand a deed, the vendor will be in a position to convey title.''

Appellant cites certain other cases to the same effect. It will readily be seen that these cases are not in point where there is no executory contract in connection with the sale.

■ There is a conflict in the evidence on the question of the representations made as to title and the claims of others thereto. This court, therefore, must accept as true that testimony which tends to support the findings, together with all reasonable inferences therefrom.

■ It is never presumed that a party has committed a fraud, and where fraud is alleged for the purpose of depriving him of a right it must be clearly made out. (*McCarthy* v. *White*, 21 Cal. 495 [82 Am. Dec. 754]; *Ryder* v. *Bamberger*, 172 Cal. 791 [158 Pac. 753]; *Wendling etc. Co.* v. *Glenwood etc. Co.*, 153 Cal. 411 [95 Pac. 1029]; *Casey* v. *Leggett*, 125 Cal. 664 [58 Pac. 264]; *Abrams* v. *Daugherty*, 60 Cal. App. 297 [212 Pac. 942]; *Everett* v. *Standard Acc. Ins. Co.*, 45 Cal. App. 332 [187 Pac. 996].) To establish fraud the evidence must be clear, satisfactory and convincing. (*McCarthy* v. *White, supra;* 12 R. C. L. 183.) Such has been the rule in this state from an early date and such the rule continues to be.

■ Respondent testified in part as follows: ''He (Dockins) told Mr. Wolfe (appellant) that he brought me down, that I was in the market for a rig, and Mr. Wolfe said he had two for sale and we got in the car and came down to look at them. Mr. Mabry: Q. Where were they located? Witness: A. At the corner of Sixteenth and Olive streets, Huntington Beach. Q. When you got there, did you

have any further conversation with him? . . . A. We talked the matter over and I asked Mr. Wolfe if he owned them and he said he did. I told him I didn't want both of them, I just wanted one, and asked what he wanted for them and he said he wanted thirty-five hundred dollars for the two. I told him I didn't care only about one, I just needed one, and he said he would rather sell all of them, so we talked about one thing and another and I said, 'Now just what do I get if I just buy this?' He said, 'You will get everything, it all belongs to me, everything you see, even the pipe in the hole. If you take it, you will get the pipe in the hole.' I told him I didn't want the pipe, I just needed the derrick. That was the general line of conversation,—that was practically all. . . . I asked him what he would take for the one rig, not the two rigs, and he asked me fifteen hundred dollars for it. I told him it was second-hand materials, and a salvage sale, it was too much money, that I would give him a thousand dollars. He said he couldn't sell this for that. I said that was too bad, but that was all I could give. I asked him if there was anything against this and he said not that he knew of excepting a sign which was posted upon the rig and the city taxes. I asked him about that and he said he didn't know if they had been paid or not. I asked him how much he thought they would be and he said probably fifty dollars but it might be more than that. I said if it was only fifty dollars I will pay that fifty dollar taxes above the thousand dollars. I said I wondered if we could find out more about the taxes and he said, 'Yes, by going down to the city hall', so we went down to the city hall, but it was on Lincoln's birthday, a holiday, and it was closed. He said he knew Mr. Rossin, the city engineer, he lived right across the street, we would go over there and he would probably have some idea. . . . (Speaking to Mr. Rossin) Mr. Wolfe stated what we came over there for,—he said he was selling me one of those rigs that he owned down on Sixteenth and Olive streets and we came over there for the purpose of finding out if he knew how much taxes, or if any taxes were due against them and how much they were, and he said he didn't think it was over fifty dollars,—that this might be for the last year's taxes, which would be fifty dollars I think he said was due.''

Respondent then ordered his employees to dismantle the derrick, preparatory to moving the same, but shortly after they began to do so they were notified by other parties that they owned the property, which fact was reported to the respondent. Respondent further testified: "Upon these claims being made against the property what did you do? Witness: A. I thought I better examine it and see if Mr. Wolfe had title to it. Q. What did you do? A. I went down to Mr. Wolfe's house and told him I understood he didn't have full title to that property down there. Q. What did he say? A. He said he did. Q. Was anything else said? A. So we got in the car and we drove back down to where the rigs were and Mr. Gifford came out and I said to him, 'Well, we are going to Santa Ana to see about the title to this property, so you better not do any more here until I find out where we stand on this. I don't want to get mixed up in any affairs that are not right.' Then I said, 'Mr. Wolfe says he owns it and I want to find out about it.' Q. Now, what did the gentleman at the sheriff's office advise you upon inquiries being made there? A. Well, we met the gentleman there and he said— . . . Q. Now, at this conversation, did you have a conversation at the sheriff's office? Witness: A. Yes, sir. Q. All right; who were present? A. Myself, Mr. Wolfe and I didn't know the other gentleman's name, the sheriff. Q. State just what was said, Mr. Severns. A. Well, I asked him what title Mr. Wolfe had in that property over there and he said he didn't have any. I asked him what he sold and he said he sold a nigger's interest. (Referring to Bailey and White). I said to Mr. Wolfe, 'I didn't buy no interest, I bought the whole outfit and you agreed to give me a clear title to the rig. You said you owned it', and he said 'No, they just sold the niggers' interest and that's what I sold you'."

Appellant testified: "Did you ever tell Mr. Severns you were the owner of the property? . . . I only told him I had a sheriff's bill of sale. Mr. Mabry: Q. You never told him you were the owner of the property? . . . He didn't answer the question yet. The Court: Answer the question. Read the question, Miss Reporter. . . . The Court: Answer the question. Did you tell him that or not? Do you understand the question? Witness: A. Yes. The Court: Will you answer it then? Witness: A. I don't believe I did, only

the way I stated it. Mr. Mabry: Q. you are not positive whether or not you did? Witness: A. No; I am not.''

In the case at bar the defendant went to the place where the property was located and after examining that which he desired to buy he made two direct and pertinent inquiries and two only. First, ''What do I get if I buy this property?'' Second, ''Is there anything against it?'' As to the first inquiry he was told ''I own it. You get it all from the crown block down, including the pipe in the ground.'' As to the second he was told, ''There is no claim against it that I know of except the city taxes.'' The defendant was satisfied with what he saw and agreed to purchase a derrick, tanks, tools, etc., after having been told by appellant that he owned said property, that he got it all, that there was nothing against it except the city taxes, which, in the opinion of appellant, would not exceed $50.

*Blake* v. *Arp.* 180 Cal. 144 [179 Pac. 683, 684], is a case where fraud was alleged and found. The basis for such allegation and finding was that defendant therein was the owner of a lot and sold the same to plaintiff, stating to plaintiff that he owned the title to said lot. At the time of the purchase a *lis pendens* was on record in the case, which resulted in a judgment against himself and his vendee (plaintiff in said cause). The court said: ''The jury was justified in finding him guilty of fraud under the circumstances even though he believed the truth of his assertion (Civ. Code, sec. 1572, subd. 2) and they were so instructed by the court. Appellant urges the fact that the evidence was insufficient to show any fraud on his part for the reason, as he claims, that plaintiff knew as much about the title as he did, and that therefore his statement was a mere expression of opinion, and cites in relation thereto the following cases: *Choate* v. *Hyde*, 129 Cal. 580 [62 Pac. 118]; *Rheingans* v. *Smith*, 161 Cal. 362 [Ann. Cas. 1913B, 1140, 119 Pac. 494]. . . . Moreover, the evidence of plaintiff was that she was constantly lulled into inaction by the repeated assertion of defendant that he had the title, notwithstanding the allegations of the plaintiff in said suit.''

*Crandall* v. *Parks*, 152 Cal. 772 [93 Pac. 1018], is a case wherein the plaintiff was the owner of certain real and personal property and the defendant in order to induce plaintiff to make an exchange for his property in Oregon and

a restaurant in San Diego made certain representations as to the value of the Oregon land and the ownership of personal property. The personal property concerning which the representation of ownership was made consisted of a hot water tank and a refrigerator represented to belong to the defendant when in fact it did not. An exchange of property was effected, plaintiff being induced to make the same solely by reason of such representations as to value and ownership, upon which he wholly relied. Defendant well knew that plaintiff in making the exchange relied and acted solely upon these representations. In this case the court said, at page 776: "A statement as to the value of property is not always made as a mere expression of opinion upon which the other party has no right to rely. It may be a positive affirmation of a fact intended as such by the party making it, and reasonably regarded as such by the party to whom it is made. When it is such, it is like any other representation of fact, and may be a fraudulent misrepresentation warranting rescission. The rule in regard to this matter is stated by Mr. Pomeroy as follows: 'Wherever a party states a matter which might otherwise be only an opinion and does not state it as the mere expression of his own opinion, but affirms it as an existing fact material to the transaction, so that the other party may reasonably treat it as a fact and rely and act upon it as such, then the statement clearly becomes an affirmation of fact within the meaning of the general rule and may be a fraudulent misrepresentation.' (2 Pomeroy's Equity Jurisprudence, 878.) . . . That plaintiff never made or commenced an investigation for himself as to the value of the Oregon land or the ownership of the personal property, that he believed and relied solely on the statements and representations of defendant in relation thereto and that he was induced to make the exchange solely by reason thereof, is all fully established by the findings, which are conclusive upon this appeal. We know of no reason why defendant should be allowed to maintain that plaintiff was not entitled to rely without investigation on his part, upon a representation as to the value of the land so remotely situated, which he had never seen and could not personally examine, a representation 'to the truth of which the party has deliberately pledged his faith'. (See *Dow* v. *Swain*, 125 Cal. 681, 684 [58 Pac. 272, 274].)

He was clearly entitled, also, to rely upon the representation as to the ownership of the personal property.''

In *Oppenheimer* v. *Clunie*, 142 Cal. 313 [75 Pac. 899, 901], the court says in quoting Mr. Justice Temple in *Colton* v. *Stanford*, 82 Cal. 398 [16 Am. St. Rep. 137, 23 Pac. 16]:

''The power to cancel a contract is a most extraordinary power. It is one which should be exercised with great caution,—nay, I may say, with great reluctance,—unless in a clear case. A too free use of this power would render all business uncertain, and, as has been said, make the length of the chancellor's foot the measure of individual rights. The greatest liberty of making contracts is essential to the interests of the country. In general the parties must look out for themselves.

''It is stated in *Southern Development Co.* v. *Silva*, 125 U. S. 250 [31 L. Ed. 678, 8 Sup. Ct. Rep. 881], that in order to justify a court of equity in setting aside a contract on the ground of fraudulent representations the complainant must show by clear and decisive proof:

'' 'First—That the defendant has made a representation in regard to a material fact.

'' 'Secondly—That such representation is false.

'' 'Thirdly—That such representation was not actually believed by the defendant, on reasonable grounds, to be true.

'' 'Fourthly—That it was made with intent that it should be acted on.

'' 'Fifthly—That it was acted on by complainant to his damage; and

'' 'Sixthly—That in so acting on it, the complainant was ignorant of its falsity, and reasonably believed it to be true.'

''This court said in *Colton* v. *Stanford*, 82 Cal. 399 [16 Am. St. Rep. 137, 23 Pac. 28]: 'A misrepresentation as the basis of rescission must be material; but it can be material only when it is of such character that if it had not been made the contract would not have been entered into. The misrepresentation, it is true, need not be the sole cause of the contract, but it must be of such nature, weight and force that the court can say ''without it the contract would not have been made.'' '

'' . . . The rule is thus stated by Pomeroy in his work on Equity Jurisprudence (sec. 893): 'If after a representa-

tion of fact, however positive, the party to whom it was made institutes an inquiry for himself, has recourse to the proper means of obtaining information, and actually learns the real facts, he cannot claim to have relied upon the misrepresentation and to have been misled by it. Such claim would simply be untrue. The same result must plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences, or purports or professes to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he was misled.' And again the same author says (sec. 894): 'If in a contract of sale or leasing, representations are made by the vendor concerning some incidents, qualities, or attributes of the subject-matter which are open and visible, so that the falsity of the statement is patent to an ordinary observer, and it is made to appear that the purchaser at, or shortly before, the concluding of the contract, had seen the thing itself which constitutes the subject-matter, then a knowledge of the facts is chargeable upon such party; he is assumed to have made the agreement knowingly, and cannot allege that he was misled by the false representations.' ''

In the case at bar said representations were material and respondent relied on them and delivered his check to appellant in payment for said property. Certainly such representations were false. Appellant knew them to be false, because he was informed by his attorney that the only interest he had in said property was the interest of the judgment debtors. Second, the record is silent as to any other or further knowledge of appellant concerning his ownership of said property. The record does not show any knowledge on the appellant's part to justify his claim of ownership. Such information did not justify a representation of ownership of any title at all. (Civ. Code, sec. 1572; *Blake* v. *Arp, supra.*) Plaintiff told defendant that he knew of no claims against the property except city taxes, which would not be more than $50 in his opinion.

Does the fact that he was shown a sheriff's certificate of sale, and looked at the description of the property therein and upon inquiry was again told that the title was good, deprive the defendant of his right to rely upon those representations? We think not. Appellant must have known that the sheriff's certificate of sale carried with it the title of the judgment debtors and no more, and the respondent had a right to believe that the appellant was aware of the title he had received by virtue of the sheriff's certificate of sale. But to be certain, he again asked if the title was good. Then, if not before, appellant must speak the truth, because he knew then, if not before, that the respondent was relying upon his representations without investigation. That is, appellant was then, if not before, legally bound to disclose the nature of the title of the judgment debtors, or at least to state to respondent his lack of knowledge concerning the same. Having failed so to do, appellant's statement that the title was good was in fact a fraud. (Civ. Code, sec. 1572; *Blake* v. *Arp, supra; Crandall* v. *Parks, supra.*)

Further, taking the representation that there were no claims against the property excepting city taxes in a sum less than $50, in the opinion of the appellant, appellant joined the creditors' committee, Spraul, Fairchild and Gale, as parties defendant with Bailey, White, etc., in the action out of which the judgment and execution sale and sheriff's certificate arose and upon the creditors' committee's representation in open court of the contract between the creditors' committee and Bailey and White et al., appellant dismissed the cause of action as to the creditors' committee and continued to prosecute said cause as to Bailey and White to judgment, caused execution to issue in said cause and upon the execution sale, before buying said property, was present when one of the creditors' committee, Spraul, announced to all present that they claimed such property. Plaintiff does not remember the statement so made, or if one was made. However, his attorney heard such a statement. His attorney, a number of times, advised appellant that all he got by the said purchase was the interest of the judgment debtors and that was all he had a right to sell. Further, plaintiff must have known that the defendant was making these inquiries as to title and claim of others, to know what he was buying, and that he was relying upon him, appellant, for his

information relative thereto. Appellant apparently either paid no attention to what was going on at the sale and gave no heed to his attorney's advice or as to what title he had purchased or received and therefore erroneously believed he had a good title, or else he knew he had no title to said property and knew there were claims by others to said property, and thought by lulling the said respondent into inaction by his continued affirmation that the title respondent was getting was good and that there were no others claiming the same, that he would get the $1,000, in entire disregard of respondent's rights. The evidence shows that such price was a fair and reasonable value of the property agreed to be sold. In such circumstances the respondent had a right to rely upon the representation that the appellant knew of no claims against said property except the taxes. The representation as to title was a representation of a material fact and false, and not the expression of an opinion. (*Blake* v. *Arp, supra;* Civ. Code, sec. 1572.) The representation as to the appellant having no knowledge of any claims except city taxes was a representation as to a material fact and false. (*Crandall* v. *Parks, supra.*) Such representations were relied upon by respondent. Said representations were the inducing cause of the contract. There can be no doubt but that without them no contract would have been entered into. (*Craig* v. *Shea,* 45 Cal. App. 351 [188 Pac. 73]; *Colton* v. *Stanford,* 82 Cal. 399 [16 Am. St. Rep. 137, 23 Pac. 16]; *Oppenheimer* v. *Clunie, supra.*)

Fair dealing, common honesty and good conscience required the appellant to make a full disclosure as to the title and other claims known by him to be against the property, rather than to continue to lull this confiding defendant into a continuance of his belief in the representations of the plaintiff. Appellant having failed to do so, was guilty of fraud in procuring the $1,000, and the whole contract was void *ab initio.* There was therefore no consideration for the check for $1,000. Other objections urged are devoid of merit. The findings are abundantly supported by the evidence and the judgment is not against the law.

Judgment affirmed.

Marks, Acting P. J., and Barnard, J., concurred.