[Civ. No. 13809.   First Dist., Div. One.   Feb. 17, 1949.]

A. D'ACQUISTO et al., Respondents, v. TOM EVOLA et al.,
Appellants.

Gladstein, Andersen, Resner & Sawyer and Ewing Sibbett for Appellants.

Hudson, Martin, Ferrante & Street for Respondents.

PETERS, P. J.—Plaintiffs brought this action for breach by defendants of an alleged agency contract whereby plaintiffs were to buy, weigh, load, pack and ice sardines for defendants, and were to receive a fixed sum per pound for their services. Defendants denied the major allegations of the complaint, including those relating to the claimed agency, contending that the transaction was in fact a sale, and cross-complained for damages for breach of warranty. The trial court found that defendants appointed plaintiffs their agents to purchase fresh sardines; that pursuant to this contract of agency plaintiffs purchased for defendants 23 tons, 850 pounds of fresh sardines; that defendants accepted delivery of some of the sardines, but refused to accept 27,400 pounds; that plaintiffs were forced to sell these sardines at a substantial loss; that plaintiffs were damaged in the sum of $2,496.25; that defendants were not damaged as claimed. Judgment was entered for plaintiffs in the total sum of $2,496.25, and from that judgment defendants appeal.

Defendants, for many years, have been in the business of selling sardines for bait in the San Francisco Bay area. Plaintiffs, for many years, have been in the business of buying and selling fish, including sardines, at wholesale, in Monterey. In the fall of 1946 there was a scarcity of sardines in Northern California, and defendants found it difficult to secure sardines for their customers. At times they found it necessary to go as far south as San Pedro to get sardines. In late October or early November defendant Dominic Strazzullo visited Monterey and talked with plaintiff Victor D'Acquisto. According to Victor, the parties then agreed that if plaintiffs discovered sardines of the desired quality in Monterey, they were to telephone defendants, and, if defendants ordered the fish, then the plaintiffs were to buy them for defendants, the plaintiffs to unload, ice and box the fish, and to load them on defendants' trucks. Plaintiffs were to receive a fixed amount per pound for these services.

On November 13, 1946, defendants bought a boatload of sardines from plaintiffs and from Howard Low. There is no

doubt that these fish were quite large, averaging about 12 inches in length, and were very firm. Low, and some of the other witnesses, testified that these fish were of a type known as "Washington Huskies," the largest of the coast sardines. This transaction was completed to the satisfaction of all concerned.

On November 27, 1946, Victor D'Acquisto learned that a fisherman by the name of Marinano had a boatload of sardines in Monterey harbor. He immediately visited Marinano and was told by him that he had 22 or 23 tons of very good quality sardines in the hold of the ship. At that time the dealers were offering five or five and one-half cents a pound for the sardines, and Marinano was holding out for seven cents. Victor believed that he could buy the entire load at six cents a pound. Victor did not then, or at any other time here pertinent, go on the boat to examine the fish. It was then about 7:30 a. m. Victor immediately telephoned Dominic Strazzullo in San Francisco and asked him whether he wanted the fish at six cents a pound. He testified that at this time he had not offered to buy the fish from Marinano; that he told Dominic that Marinano had told him that they were large fish. Dominic told him that he would see if he could locate two of his trucks, which were at San Pedro, and would telephone back. Before the second telephone call, Victor walked over to Marinano's boat, and, from the wharf, examined the sardines by looking into the hold, and then had a second conversation with Dominic. He then told him that the sardines were "large" sardines of the same "quality" as the last order; that "the quality of the sardines was as good as he got before"; that they were large sardines of good quality—a good sardine; that Dominic then instructed him to buy the entire boatload at six cents a pound, and to see that no one else got them; that he would send two trucks from San Francisco and order the two trucks up from San Pedro. Under the arrangement plaintiffs had with the defendants, the latter were to furnish the boxes. When Victor mentioned this to Dominic the latter first requested Victor to borrow boxes, and, when Victor stated that this could not be done, Dominic ordered Victor to unload the fish and to dump them "on the floor" to await the arrival of the trucks. Pursuant to these instructions, plaintiffs purchased the entire load for six cents a pound and had the fish unloaded. In the late morning Sal Strazzullo, one of the defendants, arrived from San Francisco. He testified that, immediately upon observing the fish, he

told Victor that they were small, mushy and mixed, and no good for bait, and that they would not buy them. Sal thereupon telephoned Dominic and Dominic told him not to buy the fish, but to bring home a few tons for crab bait. At that time the fish had been unloaded for two and one-half hours. The evidence is, that sardines deteriorate very rapidly unless iced, and, of course, when unloaded, the fish that were at the bottom of the hold were on top of the pile on the wharf. Several telephone conversations took place between Sal and Dominic, and Victor and Dominic. At all times Victor insisted that the fish belonged to defendants. Defendants finally loaded about half the fish onto their trucks and have offered to pay for them at the agreed-upon rate, but refused to take the balance. Plaintiffs took various samples of the fish and had them frozen, and they were introduced into evidence at the trial. They averaged in length about 8½ inches. Those fish that defendants refused to accept, plaintiffs sold at two cents a pound, and brought this action for the balance.

*Is the finding of Agency supported?*

Defendants contend that the transaction was a sale and not an agency. They cite authorities for the point that an agency must rest upon agreement (*Naify* v. *Pacific Indemnity Co.*, 11 Cal.2d 5 [76 P.2d 663, 115 A.L.R. 476; 1 Restatement of Agency, § 15) ; that the party asserting the existence of an agency has the burden of proving that fact (*Ewing* v. *Hayward,* 50 Cal.App. 708 [195 P. 970]) ; that the presumption is that a person acts for himself and not as agent for another. (*Brooks* v. *Johnson,* 22 Cal.App.2d 618 [72 P.2d 194] ; *Walsh* v. *American Trust Co.,* 7 Cal.App.2d 654 [47 P.2d 323] ; *Hathaway* v. *Siskiyou etc. School Dist.,* 66 Cal.App.2d 103 [151 P.2d 861].) These principles of law are not challenged by plaintiffs, and may be accepted as correctly stating the applicable law. Appellants then refer to portions of the record where Victor testified that his agreement with defendants was to *"sell"* them fish, and also point to the evidence that payment for the sardines was to be made to plaintiffs and not to Marinano. That evidence might have supported a finding that a sale was intended. But, unfortunately for defendants, there is other substantial and credible evidence that supports the findings that the parties entered into an express contract of agency. Victor clearly and unequivocally testified that the arrangement was that "If any sardines were brought into Monterey Bay I was to notify

Dominic immediately and he would convey to us or we would convey to him the type of sardines, the amount, the price, and then he would give us the orders to buy or not to buy,'' and that upon notifying Dominic, he was told to buy the fish for defendants at six cents a pound. This evidence supports the trial court's finding of agency.

*Did the sardines conform to the representations made by plaintiffs?*

■ This is the real question in the case, and this is so whether the transaction was a sale or an agency. Defendants assume that there was a sale, and urge that a warranty of quality and fitness for a particular purpose existed and was breached. As already pointed out, as between plaintiffs and defendants there was no sale, the relationship being that of agent and principal. But that does not solve the problem here presented because it is the law that if the plaintiffs, as agents, contracted with the defendants, as principals, to buy for them a certain type of fish, and did not do so, the agents would be liable to the principals for the damage caused by the breach. (2 Restatement of Agency § 400; *Dunn* v. *Mackey,* 80 Cal. 104 [22 P. 64]; *Glantz* v. *Freedman,* 100 Cal.App. 611 [280 P. 704].)

Thus the real question is what representations were made by plaintiffs as to the type of fish involved. It is defendants' theory that plaintiffs represented that the fish were of the same size and quality as those involved in the transaction between the parties on November 13, 1946. Undoubtedly defendants so testified, and undoubtedly portions of Victor's testimony, when not read in connection with his testimony as a whole, tend to support this theory. Undoubtedly the fish involved in the transaction on November 27, 1946, were not of the same size as those involved in the earlier transaction. The evidence is uncontradicted that the sardines involved in the November 13th transaction averaged 12 inches in length, while those involved in this transaction averaged about $8\frac{1}{2}$ inches in length. But there is also evidence that the sardines involved in the first transaction were of a type known as ''Washington Huskies,'' a type of sardine much larger than those usually caught around Monterey; that the fish involved in the second transaction were good, solid, firm fish above average in length as compared with those normally caught in and about Monterey. The man who caught the fish so testified, as did an expert on the subject. The latter, in addition,

testified that he had examined the fish involved in this transaction and that they were the large sardines of the type commonly sold for bait. There is an abundance of evidence that the fish were solid and firm, although defendants testified that they were soft and mushy. The evidence shows that, except as to size, the fish were of the same quality as those involved in the earlier transaction. Even if the fish had softened up by 11:30 a. m. when Sal Strazzullo arrived, there is evidence that defendants ordered the fish unloaded and dumped on the floor, and that they remained there for at least two and one-half hours. There is also evidence that this would tend to cause the fish to deteriorate. As to size, the evidence as to the exact representations made is not as clear as might be desired, but the evidence is susceptible of the interpretation that plaintiffs did not represent that the fish were as large as those involved in the earlier transaction, but simply represented that they were ''large'' as that term was used to describe the sardines normally caught in and about Monterey. This being so, the finding that ''on the 27th day of November, 1946, pursuant to said authorization and agency, plaintiffs purchased on behalf of defendants twenty-three (23) tons, eight hundred fifty (850) pounds of fresh sardines . . .'' is amply supported.

*Were plaintiffs negligent in failing to ascertain the size of the sardines?*

██  The trial court found: ''That of [sic] the said 27th day of November, 1944 and prior to the purchase of said sardines by plaintiffs for defendants' account, plaintiffs informed defendants that said sardines were on board a fishing vessel at Monterey, and that plaintiffs had been advised by the owner of the fishing vessel that the sardines were large fish; that prior to the receipt by plaintiffs of defendants' authorization to purchase said sardines plaintiffs looked at the fish in the hold of said fishing vessel from a distance of ten or fifteen feet, the hatch of said fishing vessel being open at said time; that plaintiffs did not go on board said fishing vessel at any time prior to the purchase of said sardines from the owner of said vessel; that as a practical matter it would have been impossible to ascertain the condition or size of the sardines while they were in the hold of the vessel, and that the defendants, with full knowledge that the sardines were still on the vessel authorized the plaintiffs to purchase the entire boatload.''

It is the theory of defendants that plaintiffs were grossly negligent in not going aboard the boat to ascertain the exact quality and size of the fish. It is somewhat difficult to follow this argument. Victor testified that, when he first arrived at the wharf, he talked to Marinano, but did not go aboard the boat. Fish were very scarce. Various dealers were haggling with Marinano about the price of the fish. Time was of the essence. Victor immediately telephoned Dominic. He testified that he told Dominic what Marinano had said about the fish. Between then and the second telephone conversation with Dominic, he went back to the boat and looked at the fish through the open hatch of the sardine boat. He then had the second telephone conversation with Dominic. While there is no evidence to support that portion of the finding to the effect that "as a practical matter it would have been impossible to ascertain the condition or size of the sardines while they were in the hold of the vessel," such finding is not indispensable to support the judgment. The evidence is susceptible of the interpretation that the plaintiffs represented that the sardines were of the same quality as those involved in the earlier transaction, but as to size, were "large" and of a size ordinarily used for bait. There is evidence that such representations were true. This being so, plaintiffs did not breach their contract of agency, nor were they guilty of negligence in carrying out their contract by buying the fish for defendants.

The judgment appealed from is affirmed.

Ward, J., and Bray, J., concurred.