[Civ. No. 30348. Second Dist., Div. Five. Feb. 23, 1968.]

THE K. KING and THE G. SHULER CORPORATION, Plaintiff and Appellant, v. THERESA KING, Defendant and Respondent.

384

Hanrahan & Kippen for Plaintiff and Appellant.

Richard Morris for Defendant and Respondent.

AISO, J. pro tem.*—Plaintiff,[1] The K. King and The G. Shuler Corporation, appeals from the judgment awarding it $300 on its first amended complaint against the defendant Theresa King. Consideration of plaintiff's claims of error in light of the record and the applicable rules of law has led us to conclude that the judgment should be affirmed.

### THE FACTUAL BACKGROUND
Because insufficiency of the evidence to support the judg-

---

*Assigned by the Chairman of the Judicial Council.

[1]Plaintiff was also the cross-defendant on the cross-complaint filed by defendant Theresa King. The trial court found against Theresa King on her cross-complaint and she did not appeal. The cross-complaint is material to this appeal only insofar as it contains certain averments that King was an agent and employee of plaintiff. The legal effect of such allegations will be discussed, but otherwise reference to the cross-complaint is omitted in order to keep the issues raised by plaintiff on this appeal as simple as possible.

ment and some of the findings constitutes the gravamen of the appeal, the facts will be set forth in some detail.[2]

In June of 1962, Frank's Golden Rooster, a corporation (attorney John P. Hanrahan of counsel for appellant at trial and on this appeal being its president), had a cocktail lounge called, ''Golden Rooster'' at 2139 Westwood Boulevard, Los Angeles, California, for sale.

A Kenneth King and a George Shuler desired to purchase the ''Golden Rooster.'' For the purpose of acquiring and running the ''Golden Rooster,'' they formed The K. King and The G. Shuler Corporation. Hanrahan, as an accommodation to his corporation's purchasers, organized the plaintiff corporation under California law, obtained its permit to issue stock, and had himself approved as the escrow holder[3] to hold the stock as its issue was conditioned upon its being escrowed. (Permit was dated, July 6, 1962.)

Stock was issued to the persons and in the respective ratios shown:

| | | |
|---|---|---|
| Kenneth King | 490 shares | (49%) |
| George Shuler | 490 shares | (49%) |
| Tommy James | 20 shares | ( 2%) |

Tommy James, an inexperienced bartender, who paid no consideration for the stock issued in his name was a mere ''dummy'' for King and Shuler. Designation of James as a stockholder was for the sole purpose of providing a third record shareholder.

On or about July 4, 1962,[4] King and Shuler paid Frank's Golden Rooster, a corporation, $10,000 cash, together with two corporate notes of the plaintiff, each in the principal amount of $4,500, payable to the order of Frank's Golden Rooster, a corporation. To secure payment of said notes, both the plaintiff corporation and its stockholders executed a written Pledge Agreement pledging the one thousand shares of plaintiff to Frank's Golden Rooster. For further security, each of the individual stockholders, King, Shuler and James, guaranteed payment of the two corporate notes. Plaintiff also executed a

---

[2]Where the evidence is conflicting, the version favorable to respondent is given. (See e.g., *Marshall* v. *Marshall* (1965) 232 Cal.App.2d 232, 236 [42 Cal.Rptr. 686], and cases there cited.)

[3]The escrow holder was changed to a Leo Mack, Jr., on August 28, 1962, and he took over the custody of the issued stock.

[4]Taken from findings of fact; the notes and pledge agreement are however dated July 24, 1962.

chattel mortgage on its fixtures and gave the obligee a security interest in its lease of the "Golden Rooster" premises.

By the Pledge Agreement, Hanrahan was constituted an assistant secretary of plaintiff for so long as the notes should remain unpaid and outstanding. One note was negotiated to a Mr. Temkin; Hanrahan who became the holder of the other note, instructed plaintiff to make all note payments falling due to Temkin until his note was paid in full.

Plaintiff took over the "Golden Rooster" lease, fixtures, liquor license, and liquor inventory from Frank's Golden Rooster (the selling corporation) and commenced business operations on or about July 17, 1962. King became the active manager of the business with Shuler's consent.

In December 1962, Kenneth King married defendant Theresa King also known as Theresa Rankin Bizzelle. She began to help in various capacities around the "Golden Rooster." In February of 1963, Kenneth and Theresa had marital disagreements and separated.

On or about March 8, 1963, Kenneth King turned over the possession and operation of the "Golden Rooster" to defendant, intending thereby to give or quitclaim his complete interest in plaintiff corporation and its business to defendant. There was, however, no formal agreement entered into between them, either oral or written. On that date, Kenneth King was president and a director of plaintiff. He later executed a written resignation from both offices on a form prepared by defendant's then attorney, the senior Morris (father of defendant's attorney at trial and on this appeal), now deceased.

About this time, defendant entered into a written agreement[5] with Shuler to purchase his 49 percent stock interest for a total purchase price of $7,530. Defendant paid Shuler $1,000 upon execution of this agreement, the balance of $6,530 was to be paid on or before September 1, 1963, together with interest at 5 percent per annum. Consummation of this sale with Shuler was also to carry with it Shuler's interest in the 20 shares issued in the name of Thomas H. James (Tommy James). Failure to complete the purchase on defendant's part was to cause a forfeiture of her $1,000 down payment as and for liquidated damages. Shuler also agreed in writing to resign as a director and vice-president of plaintiff corporation, and "not interfer[e] with the business or operation thereof."

---

[5] Exhibit D shows that respondent apparently executed it on January 23, 1963, at least it is so dated.

The agreement also granted to defendant Shuler's proxy to vote his 490 shares at all stockholders' meetings, and the proxy was stated to be coupled with defendant's interest in the corporation. Defendant undertook to pay only the installments coming due on the William Tempkin (Temkin) note up to September 1, 1963, unless she consummated her purchase from Shuler.

No written or oral agreement, express or implied, was entered into by or between defendant and plaintiff relating to her proposed acquisition of the "Golden Rooster," or prescribing her duties and obligations, if any, in the operation and management thereof. Defendant dealt only with the principal stockholders and her transactions with each were separate from each other. No corporate resolution nor any other formal or informal corporate action was taken to authorize the prospective acquisition of the "Golden Rooster" or of plaintiff by defendant. There was no transfer of record of the escrowed shares certificates nor any formal notification to the escrow holder of defendant's interest in the shares.

No written instructions or memoranda (except as above noted), were given defendant to evidence her status with respect to the "Golden Rooster" or its liquor license. Defendant had no salary arrangement with plaintiff, Kenneth King, or Shuler.

Defendant had possession of the assets of plaintiff and operated its business from March 8, 1963, until July 31, 1963, with the consent and knowledge of both Kenneth King and Shuler. During this period, defendant was never an officer or member of the board of directors of plaintiff.

During the period July 17, 1962, to March 8, 1963, during which Kenneth King managed the "Golden Rooster," he made all business decisions with occasional informal discussions with Shuler. No business of plaintiff corporation was formally conducted, no directors' meetings held, nor corporate minutes or resolutions kept or passed. No profit was realized during this period, the business barely meeting current operating expenses.

Plaintiff did have a firm of accountants in Santa Monica who handled monthly accounting records, for which they charged $35 per month. After defendant took over, she discharged these accountants claiming that the business could not afford the $35 monthly charge.

Hanrahan first learned of the delinquencies on both the rent and note payments in March or April of 1963, when he received telephone calls from Temkin (note holder) and Dr. Pitts (the lessor) that the monthly payments respectively due and payable had not been forthcoming. Hanrahan then telephoned the ''Golden Rooster,'' talked to defendant, and learned that it was she who was in actual possession and running the business. He demanded that defendant bring the respective payments up to current status. In late May, he asked defendant for a financial statement of the plaintiff, but received none.

A meeting on June 12, 1963, was scheduled so that all parties concerned could ascertain the financial status of plaintiff. Hanrahan was desirous of obtaining defendant's guaranty on the two outstanding corporate notes, but defendant declined signing upon advice of counsel. During this period and whenever demands for payments were made upon defendant by Hanrahan, defendant stated to Hanrahan that business of the ''Golden Rooster'' was good and all she needed was additional time within which to make the payments.

A further meeting was scheduled for June 26, 1963. When defendant failed to appear at this meeting, Hanrahan caused the pledgee's lien on the stock to be foreclosed; the stock was sold on or about July 8, 1963, at public auction pursuant to the terms of the Pledge Agreement. Hanrahan acquired all the stock at this auction and as sole stockholder elected a new board of directors and became president of plaintiff corporation.

As plaintiff's new president, Hanrahan made oral demands upon defendant on or about July 8, 1963, to deliver up possession of the ''Golden Rooster'' to him, but defendant remained in possession until July 31, 1963, upon which date Hanrahan accompanied by two persons from the Alcoholic Beverage Control Board went to the ''Golden Rooster'' and demanded surrender of the premises. Defendant peaceably complied.

Hanrahan testified that he demanded all of the books and records of the plaintiff, but that all she handed him at that time was a stack of chits or tabs (Exhibit 5). Defendant testified that a large account book, the check book, and a batch of bills that had been paid for in cash and stapled together were on the desk in the office (backroom) when she surren-

dered possession of the premises to Hanrahan. Hanrahan did not look into the office until a few days after July 31, 1963, and he tsstified that when he looked he found no records at all.

When Hanrahan left the "Golden Rooster" on July 31, 1963, he left the cook, R. J. Miller (since deceased) in possession, instructing him that he could take home any food inventory left, and to remain on the premises until a locksmith arrived and changed the locks.

On or about July 12, 1963, defendant obtained a loan of $500 from the Trojan Amusement Company as part of a transaction in which she entered into a five-year lease on behalf of plaintiff permitting Trojan Amusement Company to install phonograph and other amusement machines in the cocktail lounge. Defendant paid $200 of this loan to the cook, R. J. Miller, in part payment of wages owed him; she used the $300 balance for her own benefit. At time of trial, plaintiff was faced with a law suit instituted by Trojan Amusement Company seeking $7,650 damages.

For nine days between July 19, 1963 and July 29, 1963, a marshal was on the premises of the "Golden Rooster" as a keeper installed by McKesson and Robbins, a creditor of plaintiff, suing on an unpaid liquor bill. The marshal took into his custody a total of $549 from the gross receipts while acting as keeper.

Defendant testified that she had difficulty keeping her various bartenders. One (Mario Losell) she had to fire for being drunk on the job and for "plain thievery."

Plaintiff produced the opinion of an expert witness to prove what it contended must have been the gross receipts for the period March 8, 1963 to July 31, 1963. The basis of his opinion consisted primarily of gross receipts figures on state sales tax returns for February and March 1963, signed by defendant, an unsigned return for April 1963, and returns for May, June and July which Hanrahan had prepared by estimates, together with the sum the marshal was able to seize while keeper during the nine-day period in July.

The evidence is uncontradicted that during the period defendant was in possession and operating the business, she paid only $709.25 on principal and interest on the two corporate notes, failed to pay bills incurred in running the business (e.g., federal and state taxes, rent, cost of liquor and groceries, and a considerable amount of wages of bartenders

392

and the cook), and failed to file any unemployment or social security returns. The estimated indebtedness of plaintiff (exclusive of the two corporate notes) rose from $2,208 on March 8, 1963, to $9,277 on July 31, 1963. The liquor inventory was almost nil and the cash registers were empty when defendant surrendered possession of the premises.

After acquisition of the shares in July, Hanrahan offered defendant an opportunity to redeem the shares of stock by paying up the indebtedness of plaintiff, but defendant never signed the agreement which Hanrahan had prepared for that purpose.

Hanrahan then caused plaintiff to institute suit against defendant for accounting and fraud upon the theory that she was plaintiff's agent and employee during the period March 8, 1963, to July 31, 1963, and for trespass for wrongful withholding between July 8, 1963, and July 31, 1963.

After the conclusion of the trial in chief on April 9, 1965, at plaintiff's request, the trial court granted an additional period from that date to May 20, 1965, to allow plaintiff's counsel to further examine defendant's personal bank account records which had just come to that counsel's attention and, if possible, to trace corporate funds into defendant's personal accounts. Further cross-examination of defendant was conducted on May 20, 1965, by plaintiff's counsel, but no proof of misappropriation of corporate assets was developed.

### Appellant's Assignments of Error

While purporting to acknowledge the rule set forth in *Marshall* v. *Marshall* (1965) *supra,* 232 Cal.App.2d 232, 236, plaintiff contends upon this appeal that (1) the trial court erred in finding that defendant was in possession of the "Golden Rooster" as a prospective purchaser (equitable owner) and not as an agent or manager of the plaintiff corporation; (2) that defendant was, in fact and law, an agent or fiduciary of the plaintiff and that the trial court, therefore, (a) should have held defendant liable to account for losses due to her failure to exercise reasonable prudence and care, (b) should have shifted to defendant the burden of adducing evidence of matters within her own knowledge to justify the increased indebtedness of plaintiff corporation while she was operating the business, and (c) should not have imposed upon plaintiff the burden of tracing corporate assets claimed to have been misappropriated by defendant; and (3) that the

evidence is insufficient as a matter of law to support the judgment below.

### ANALYSIS OF THE CLAIMED ERRORS

The pivotal issue here is whether the evidence sustained the trial court's finding that defendant was a purchaser or a prospective purchaser in possession rather than an agent or a fiduciary of plaintiff.

 The existence *vel non* of an agency is normally a question of fact. (*Brokaw* v. *Black-Foxe Military Institute* (1951) 37 Cal.2d 274, 278 [231 P.2d 816]; *Seneris* v. *Haas* (1955) 45 Cal.2d 811, 831 [291 P.2d 915, 53 A.L.R.2d 124]; *California Viking Sprinkler Co.* v. *Pacific Indem. Co.* (1963) 213 Cal. App.2d 844, 850 [29 Cal.Rptr. 194]; *Vargas* v. *Ruggiero* (1961) 197 Cal.App.2d 709, 715 [17 Cal.Rptr. 568].) The burden of proving agency is upon the party asserting its existence. (*California Viking Sprinkler Co.* v. *Pacific Indem. Co.* (1963), *supra*; *D'Acquisto* v. *Evola* (1949) 90 Cal.App. 2d 210, 213 [202 P.2d 596]; *Burbank* v. *National Cas. Co.* (1941) 43 Cal.App.2d 773, 781 [111 P.2d 740].) A determination by the trier of fact as to the existence or nonexistence of an agency upon conflicting evidence will not be disturbed upon appeal. (*Brokaw* v. *Black-Foxe Military Institute* (1951), *supra*; *Associated Creditors' Agency* v. *Haley Land Co.* (1966) 239 Cal.App.2d 610, 614 [49 Cal.Rptr. 1]; *Vargas* v. *Ruggiero* (1961), *supra*.)

The burden of proving an agency in this case was upon the plaintiff. "The law indulges in no presumption that an agency exists but instead presumes that a person is acting for himself and not as agent for another." (*Walsh* v. *American Trust Co.* (1935) 7 Cal.App.2d 654, 659 [47 P.2d 323]; see also, *D'Acquisto* v. *Evola* (1949), *supra*, 90 Cal.App.2d 210, 213; *Hathaway* v. *Siskiyou etc. School Dist.* (1944) 66 Cal. App.2d 103, 111 [151 P.2d 861].) Upon conflicting evidence the trial judge found that no agency existed.

No oral or written instructions or memoranda whatever were given defendant as to her status with respect to the "Golden Rooster" or its liquor license, nor whether she was an agent or a prospective purchaser or otherwise by plaintiff corporation or Kenneth King or Shuler. This is in striking contrast to the facts in the *Associated Creditors' Agency* case, *supra* (1966) 239 Cal.App.2d 610, 614, where one seeking a lease of a bar and restaurant and acquisition of its liquor license was definitely instructed that pending consummation

of the transactions he was to act in the capacity of a manager for the corporate owner.

Conceding that defendant in her verified answer to plaintiff's first amended complaint and in her cross-complaint pleaded that she operated and conducted the business as the authorized agent, manager, or employee of plaintiff corporation, this is not to be held conclusively binding upon her. Plaintiff denied the allegation in defendant's cross-complaint. As set forth in the pretrial conference order, there was an issue as to whether during the period March 8, 1963 to July 31, 1963, defendant was an agent or employee of plaintiff to be resolved at trial. It was litigated at trial and evidence thereon produced. Issues set forth in a pretrial conference order supersede those raised by the pleadings and control the subsequent course of trial. (*Hurd* v. *Paquin* (1964) 229 Cal. App.2d 634, 636 [40 Cal.Rptr. 524] ; *Feykert* v. *Hardy* (1963) 213 Cal.App.2d 67, 74 [28 Cal.Rptr. 510] ; *County of Kings* v. *Scott* (1961) 190 Cal.App.2d 218, 225 [11 Cal.Rptr. 893].)

If the pleadings and pretrial order be ambiguous but the issue litigated, the parties cannot thereafter claim that the issue was outside the issues of the case. (*California Viking Sprinkler Co.* v. *Pacific Indem. Co.* (1963) *supra*, 213 Cal. App.2d 844, 850-851; cf. *Breakers Holding Co.* v. *Josebra Co.* (1954) 122 Cal.App.2d 741, 748 [265 P.2d 938].)

Belief of the parties that a principal agent or a master servant relationship was created is only one of many factors in making a determination of the legal status or relationship. (Rest.2d Agency, § 220, subd. (2) and comment c, p. 486; cf. *Wright* v. *Lowe* (1956) 140 Cal.App.2d 891, 897 [296 P.2d 34].) It is, of course, a factor to be taken into consideration in making the finding, but it is not conclusively binding upon the person alleging his belief. (2 Cal.Jur.2d [Agency] § 13, p. 661.)

The parties agreed that defendant was never an officer or a member of the board of directors of plaintiff during all times pertinent to this litigation. She had no actual knowledge of what her technical status was with respect to business assets ,or of the official requirements governing the transfer of liquor licenees.

On the other hand, there is substantial evidence to support the trial judge's finding that during March 8, 1963 to July 8, 1963, defendant was a prospective purchaser or vendee in possession and the equitable owner of plaintiff and its

assets and business. She had invested some of her own funds in the enterprise. She had received Kenneth King's 49 percent interest by way of quitclaim or gift and the equitable interest of Shuler's 49 percent by her agreement to purchase, with irrevocable proxy voting rights pending completion of the purchase, and Shuler's covenant not to interfere with business operations of plaintiff. There was thus a complete surrender of control as to defendant's possession and operation of the "Golden Rooster," and control is the most important indicia of an employer-employee or master-servant relationship. (*Housewright* v. *Pacific Far East Line, Inc.* (1964) 229 Cal.App.2d 259, 266 [40 Cal.Rptr. 208]; *Alvarcz* v. *Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 999 [41 Cal. Rptr. 514]; Rest.2d Agency, § 220(1).) Moreover, Kenneth King's quitclaim or gift and Shuler's agreement to sell carried with them Tommy James' 2 percent stock interest, James having had no beneficial interest therein.

The property interest in the stock of plaintiff which Kenneth King and Shuler had before defendant came into the picture was that of pledgors. Subject to the pledgee's lien and power of sale, full legal title otherwise remained in the pledgors. (*Miller* v. *Wahyou* (9th Cir. 1956) 235 F.2d 612, 615; *People* v. *Robinson* (1930) 107 Cal.App. 211, 220-221 [290 P. 470]; *MacDonald* v. *Pacific Nat. Bank* (1944) 66 Cal. App.2d 357, 364 [152 P.2d 360].) A pledgor may sell or transfer his interest in the pledged stock subject to the interest of the pledgee. (Rest., Security (1941) § 11, comment c, p. 40.) The residual equitable property interest residing in Kenneth King and Shuler originally was transferred to and remained with defendant until the pledgee foreclosed its lien on or about July 8, 1963. (Cf. Corp. Code § 2473, repealed effective Jan. 1, 1965.)

Defendant worked for no salary, but operated the business for the purpose of obtaining sufficient funds with which to complete her purchase of the "Golden Rooster." The pretrial statement states as an admitted fact that from March 8, 1963 to July 31, 1963, defendant was negotiating or attempting to purchase some or all of plaintiff's outstanding stock.

The distinction between a buyer in possession and an agent is that the buyer has at least equitable title to the subject matter of the sale and holds it primarily for his own benefit. "The ultimate distinction is that between a fiduciary and a non-fiduciary." (Rest.2d Agency, § 14 J, comment a,

p. 73.) Analogy is also made to the law of vendor-vendee of real property. ■ A vendee in possession of real estate is not liable for rental value for use and occupation (*Belger* v. *Sanchez* (1902) 137 Cal. 614, 618 [70 P. 738]), or for damages until his interest flowing from his contract of purchase is terminated (*McKelvey* v. *Rodriquez* (1943) 57 Cal.App.2d 214, 225 [134 P.2d 870]).

■ Since the evidence was adequate to sustain the court's key finding that defendant was not plaintiff's agent, it follows that none of the burdens imposed on one who is a fiduciary could be imposed on the defendant. ■ Plaintiff, not the defendant, had the burden of proving fraud or misappropriation of corporate funds (*Provensal* v. *Michel* (1928) 89 Cal.App. 594, 597 [265 P. 580]). ■ Even where a corporate agent is concerned, misappropriation is a question of fact for the trier of facts. (3 [1965 Rev.] Fletcher Cyc. Corps. § 1116, p. 749.) ■ Where a right to an accounting arises only because of fraud, fraud must first be established. (*Fairbairn* v. *Fairbairn* (1961) 194 Cal.App.2d 501, 513 [15 Cal.Rptr. 548].) ■ He who alleges fraud has the burden of proving it at the trial level by clear and convincing evidence.[6] (*Beck* v. *Weather-Vane Corp.* (1960) 185 Cal.App.2d 688, 693 [8 Cal.Rptr. 680]; *Maslow* v. *Maslow* (1953) 117 Cal.App.2d 237, 242-243 [255 P.2d 65]; *Goggin* v. *Reliance Ins. Co.* (1962) 200 Cal.App.2d 361, 365 [19 Cal. Rptr. 446]; *Wolfe* v. *Severns* (1930) 109 Cal.App. 476, 480 [293 P. 156]; *Carroll* v. *Dungey* (1963) 223 Cal.App.2d 247, 253 [35 Cal.Rptr. 681].)

■ Plaintiff attacks defendant's credibility as a witness, but credibility of witnesses is a matter for the trier of fact and not the appellate court to determine. (*Glasser* v. *United States* (1942) 315 U.S. 60, 80 [86 L.Ed. 680, 704, 62 S.Ct. 457]; *Caldwell* v. *Taylor* (1935) 4 Cal.2d 686, 690 [52 P.2d 213]; *Page* v. *Principe* (1963) 220 Cal.App.2d 151, 155 [33 Cal.Rptr. 836].)

The defendant impressed the trial judge as being totally inexperienced in business matters and as having had no knowledge of business, nor any skill whatever in running,

---

[6]The cloud which hung over this rule stemming from *Edmonds* v. *Wilcox* (1918) 178 Cal. 222, 224-225 [172 P. 1101], has been clarified by Evidence Code, sections 520 and 115 superseding Code of Civil Procedure, section 1963, subdivision 1 and section 2061, subdivision 5, and is informative in ascertaining the proper rule to be applied even though this case was tried prior to January 1, 1967.

operating or managing a cocktail lounge or any other kind of business; that she was so lacking in business judgment as to have been extraordinarily susceptible of being taken advantage of by "artful and designing persons." Defendant had to fire one bartender for "plain thievery." Jack Greig another bartender that she married in April 1963, left her soon after the pledgee foreclosed the lien on the stock and plaintiff's new president demanded surrender of the "Golden Rooster." The business losses were attributed by the trial judge to defendant's ignorance and business ineptitude rather than to fraudulent purpose.

The trial judge found upon sufficient evidence adduced, that there was no misappropriation of corporate funds, other than of the $300 for which sum he granted judgment in plaintiff's favor. As to representations or statements to Hanrahan that the "Golden Rooster" was doing well, the trial court concluded, "Such representations were improvident, but were not fraudulently made." Defendant had no intention of misleading, but only of securing additional time to try to obtain money from outside sources with which to pay off the corporate obligations and to complete her purchase of stock from Shuler.

It is true, nevertheless, that defendant's equitable proprietary interest in plaintiff corporation and its assets was cut off by the foreclosure of the pledgee's lien; thereafter she had the duty of delivering the corporate assets, business, and records to the new president Hanrahan when he demanded surrender and possession of same, on or about July 8, 1963. Withholding subsequent to that date was a trespass for which defendant is liable in damages. (*Paap* v. *Von Helmholt* (1960) 185 Cal.App.2d 823, 828-829 [8 Cal.Rptr. 568]; *McKelvey* v. *Rodriquez* (1943), *supra*, 57 Cal.App.2d 214, 215.)

This unlawful withholding by defendant from July 8, 1963 to July 31, 1963, however, was found to be neither willful nor malicious, but due to indecision as to whether defendant could raise money to redeem the shares of stock which Hanrahan had offered her the opportunity of doing. She likewise removed no liquor, cash, nor corporate records from the premises during this interval. She surrendered the premises peaceably on July 31, 1963. These findings exclude any exemplary or punitive damages, but not compensatory damages.

But as to the extent of the compensatory damages,

the proof is nebulous. During the nine days between July 19, 1963 and July 29, 1963, the marshal's office had a keeper on the premises of the "Golden Rooster." The keeper siphoned off $549 from the gross receipts during that period at the behest of McKesson and Robbins, a creditor of plaintiff. Operation of the business to the extent of decreasing the liabilities (including costs of attachment) of plaintiff resulted in a benefit to the plaintiff. This might well have completely offset the damages suffered, but the burden of proving the amount of compensatory damages was on the plaintiff.

The gravamen of the entire appeal is actually a request for a review of issues of fact resolved upon conflicting evidence. The evidence was in all respects adequate to sustain the findings when viewed in the light most favorable to respondent (defendant) and all intendments and reasonable inferences made to sustain the findings and judgment below. "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231].) (Italics in the original.)

Judgment is affirmed.

Stephens, Acting P. J., and Hufstedler, J., concurred.