[Civ. No. 12620. First Dist., Div. One. Oct. 16, 1944.]

GRAEME MacDONALD, Appellant, v. PACIFIC NATIONAL BANK OF SAN FRANCISCO (a National Banking Association), Respondent.

Walter Slack for Appellant.

Cooley, Crowley & Supple and L. M. Bledsoe for Respondent.

WARD, J.—This action, in the nature of conversion, was brought for the recovery of certain personal property pledged to the defendant, Pacific National Bank of San Francisco, by Dalmo Manufacturing Company as security for the payment of a number of promissory notes upon which at the date of the commencement of the action the sum of $5,421.23 remained due, or for damages in case the return of the property could not be had; also for the recovery of $5,000, the amount of a cashier's check pledged to the defendant by T. I. Moseley, president of the Dalmo company, for the same purpose. MacDonald is the present assignee of both Dalmo Manufacturing

Company and T. I. Moseley of the property respectively pledged by them which consisted of life insurance policies, cash in the sum of $10,454.17 collected by the defendant upon the death of the insured (an officer of the Dalmo company) under one of such policies, accounts receivable, proceeds of some of such accounts, warehouse receipts for eight "Beautiform" machines and the cashier's check for $5,000.

The cause of action was set forth in several counts, and the total of damages prayed for by P. F. Richmond, the original assignee, is the sum of $18,344.15. Upon the death of Richmond, Graeme MacDonald, the real party in interest, was substituted as plaintiff. Judgment was awarded him for the return of certain items of property and for $872.70. Being dissatisfied with this sum which, he contends, is $12,960 short of the amount which should have been awarded him, plaintiff has taken this appeal.

The evidence, so far as material, may be summarized as follows: For some time prior to November 6, 1940, Dalmo Manufacturing Company, of which T. I. Moseley was president and the largest stockholder, had maintained close business relations with the defendant, using the bank as a source of capital and giving notes for loans made by it. Two types of loans were used: commercial, evidenced by promissory notes, and loans arising from the discounting of accounts receivable. On the above date the Dalmo company owed the bank amounts aggregating the sum of $32,647.51, those of the notes which were secured being by pledges of property of the character indicated above which had a value at the time of $19,384.42. The property so pledged had been transferred to the bank by absolute assignment. The Dalmo company had at this time become involved in financial difficulties, was insolvent and threatened with bankruptcy. A creditors' committee had been formed, among the members of which were Moseley, representing the company, and Earl LeMasters, vice president of and representing the bank. A plan was evolved by the committee by which Graeme MacDonald, plaintiff herein, undertook to buy at forty cents on the dollar creditors' claims against the Dalmo company if he could obtain 75 per cent in value of such claims. Moseley and LeMasters had a number of conferences, at which Moseley urged the bank as the largest creditor, to participate in the plan. He represented that in order to obtain this 75 per cent it was necessary that

the bank put in a past due note (unsecured) of the company in the amount of $21,600. After much discussion LeMasters agreed to recommend to the president that the bank do so, provided that the bank should thenceforth be regarded as the owner of the collateral then in its possession, the value thereof to be credited against the indebtedness of the Dalmo company. There is evidence that Moseley took the position that while such an arrangement was satisfactory to him he doubted its legality and believed that it was a legal question for the lawyers to settle. As a witness at the trial LeMasters testified with reference to this point as follows: "Q. What was your proposal? A. Our proposal was that we were to sign if we would retain the assets that we held; in other words, they were to become ours for whatever they were worth—— I mean that at that time it was evident that there was—— would result in a loss of $4,600."

Having reached this point in the negotiations LeMasters and Moseley went into the office of the bank's president, H. R. Gaither, and informed him of the situation. The latter was also called as a witness at the trial and testified on the same subject. He stated: "Mr. Moseley brought in the question of buying the note of the Dalmo Manufacturing Company for the payment of forty cents on the dollar. We told him that we would go forward with it, provided that we retain all the collateral that we had in our possession. . . . I asked Mr. Moseley if that matter was satisfactory to him and to the Dalmo Manufacturing Company, and he said it was."

Moseley testified at length on the same point. After denying that LeMasters had ever made the retention by the bank of the collateral held by it a condition of selling to the plaintiff its $21,600 note the following occurred: "The Court: Q. Let me understand, now: When Mr. LeMasters claimed absolute ownership of these collaterals, so-called, did you, then, protest, and say: 'Well, then, I won't go on with it under those circumstances?' A. No. I merely said that he could hold anything that legally he could hold, that it would probably come to a controversy." And again, "Q. All right. Now, as I understand your answers to one of the judge's questions . . . you said that Mr. LeMasters said to you that all the collateral was theirs, is that correct? A. Yes. Q. Well, when he said that, you did not make any objections, did you? A. I told him it was—— I said that: 'If you can hold this

collateral legally, if you have the legal right to hold it, there is nothing I can do.' '' As the result of the understanding so arrived at the bank assigned to M. B. Heffey, nominee of the plaintiff, the note, specifically as unsecured.

At this point it may be well to note that the loans in the amount of $32,647.51 were secured by the above cashier's check for $5,000, a general agreement by the company providing that all property transferred should be held by the bank as security, a master "assignment of accounts receivable" and assignments of four life insurance policies aggregating $35,000. Among such policies was one for $10,000 upon the life of one of the officers of the company. This policy was given a "turn in" or cash value of $3,640.04. Upon the death of such officer several days after the assignment to Heffey the face value of the policy was paid the bank, and such payment evidently led to the institution of the present suit.

The trial court found that "on November 6, 1940, the defendant and T. I. Moseley, acting for himself and for the Dalmo Manufacturing Co., agreed with the defendant that if the defendant would sell and assign to M. B. Heffey, agent, nominee and trustee for Graeme MacDonald, the unsecured promissory note of Dalmo Manufacturing Co. in the principal amount of $21,600 for the sum of $8,640.00, that the defendant could and should retain all of the collateral security held by the defendant at that time, as its own personal property; . . . that in said agreement of November 6, 1940 by and between the defendant and T. I. Moseley and the Dalmo Manufacturing Co. there was an implied condition that in the event that the defendant should satisfy and liquidate in cash all of the indebtedness of the Dalmo Manufacturing Co. from said assets so acquired by the defendant, including the remaining 60% of the face value of the promissory note for $21,600.00 so sold and assigned to M. B. Heffey, that the defendant at its convenience would deliver to the assignors of the plaintiff any assets in kind so remaining."

Judgment was accordingly entered for plaintiff for the amount of cash on hand and the collateral remaining with the bank after the Dalmo company's entire debt to it had been satisfied. Included in the amount of such indebtedness, as found by the court, is 60 per cent of the $21,600 note, by which, as stated, the plaintiff claims the judgment to be insufficient.

While on his appeal appellant urges a number of points for the reversal of the judgment, the vital questions at the trial and on this appeal are whether as a result of a conversation on November 6, 1940, between Gaither and LeMasters representing the bank, and Moseley representing Dalmo and himself, the bank cancelled the remaining indebtedness of Dalmo in exchange for full legal title to the collateral, and whether there is an implied condition as set forth in the findings.

One difficulty faced by respondent on appeal is that some of the findings and conclusions of law are not in fact approved by it so that, in presenting its side of the case, the bank is in some instances forced to condemn or only half heartedly endorse a finding. Respondent bank did not appeal. It is necessary that this court accept the findings affecting respondent as a true determination of the facts, and the conclusions as a correct determination of the law. (*Coulter* v. *Sausalito Bay Water Co.,* 122 Cal.App. 480 [10 P.2d 780]; *Ginsberg* v. *Faraone,* 126 Cal.App. 337 [14 P.2d 777]; *Holmes* v. *Anderson,* 90 Cal.App. 276 [265 P. 1010]; *Kern Oil Co.* v. *Crawford,* 143 Cal. 298 [76 P. 1111, 3 L.R.A.N.S. 993]; *Seaward* v. *Malotte,* 15 Cal.304; *Lacoe* v. *Wolf,* 218 Cal. 167 [21 P.2d 555]; *Billings* v. *Farm Development Co.,* 74 Cal.App. 254 [240 P. 298]; *Cherney* v. *Johnson,* 72 Cal.App. 725 [238 P. 150].)

Some of the contentions of appellant, if upheld, might result in a determination that the judgment in his favor of approximately $5,534.67 was not well grounded legally. Appellant desires a reversal, but, as we understand his position, a reversal only to the extent of increasing the judgment. At this point it may be well to note that if the trial court had not found "the implied condition" appellant would not be entitled to anything.

The bank's claim to absolute ownership of the collateral is based upon the transaction of November 6, 1940. The court so found, but held such ownership to be under an implied condition, namely, that if the bank should, from the assets it had acquired, satisfy all of the indebtedness of the Dalmo company, including the face value of the promissory note assigned to Heffey, the bank would, at its convenience, deliver to plaintiff's assignors any assets so remaining. In a word, the bank was declared to be the absolute owner of the collateral if the sale thereof brought an amount insufficient, or just sufficient, to satisfy the entire indebtedness of the Dalmo

company.. Under such circumstances the matter would be at an end. However, if the sale brought an amount in excess of the indebtedness then defendant was to pay any surplus to plaintiff.

Relative to the finding that the bank is the absolute owner of the collateral, appellant argues that the evidence is insufficient to uphold this finding. Eliminating any possible legal objection for the present, and considering the contention as a purely factual matter, the evidence heretofore set forth preponderates that on November 6, 1940, Moseley, acting for himself and the Dalmo Manufacturing Company, agreed with the representatives of the bank that the note of the Dalmo company in the principal sum of $21,600 should be sold for $8,640 and that the bank should retain all of the collateral security held at that time as the property of the bank.

It is the view of appellant that the legal effect of the November 1940 transaction does not support a finding of absolute ownership but establishes only a security interest. In brief, it is the contention of appellant that the finding of "implied condition" is inconsistent with the finding of "absolute ownership." The findings may have been phrased differently but when read in their entirety it is plain that the court found that the Dalmo company agreed that if the collateral was insufficient or merely sufficient to pay the bank it was to be held as the personal property in absolute ownership of the bank, but that any surplus over such indebtedness should be paid to the assignors of plaintiff. This was in accordance with the condition attached to the pledge. To obtain the consent of the bank to the sale of the $21,600 promissory note for the sum of $8,640 it was necessary that there should be an acquiescence in the demand of the bank that all of the collateral should be retained by it.

The fact that legal title remains in the pledgor with the apparent title in the pledgee (*A. Paladini, Inc.* v. *Durchman*, 24 Cal.App.2d 440 [75 P.2d 553].; *Tracy* v. *Stock Assurance Bureau*, 132 Cal.App.. 573 [23 P.2d 41]), unless otherwise provided in the pledge contract, merely means that up to the time of the payment of the debt, legal title to the collateral is in the pledgor, subject to a lien thereon in favor of the pledgee. In case of default the pledgee of collateral may in good faith sell the security and the purchaser acquires an absolute title. There may still remain be-

tween the pledgor and the pledgee the relationship of trustor and trustee (*Hudgens* v. *Chamberlain*, 161 Cal. 710 [120 P. 422]), requiring the pledgee, in the event that there is a surplus over the amount due him, to pay it over to the pledgor. This rule is well established in pledge transactions where there is a default. ■ We can see no reason for applying a different rule where the pledgor has consented to a disposition of the evidence of the debt. If there is an agreement, the parties are bound by it. In this case there is evidence of an agreement that absolute ownership of the collateral should vest in the pledgee. The court so found and added a finding that there was an implied condition that the bank would return to the pledgor any assets remaining after the payment of the indebtedness.

■ The contention that the agreement of November 6, 1940, plus the actions of the bank subsequent thereto indicate that there was no change in the bank's position, and that the evidence does not sustain the finding, relate to questions of fact, which appear to have been established not only by substantial but by clear and unequivocal evidence. The same statement may be made relative to the fact that there was no intent on the part of the bank to defraud any of the parties involved. The acquiescence of Moseley alone is sufficient to uphold the finding that there was such an agreement. (*Young* v. *Bruere*, 78 Cal.App. 127 [248 P. 301].)

Eliminating the question of the sufficiency of the factual evidence to justify the findings relative to the agreement of November 6, 1940, appellant contends that there was no written memorandum of the sale of the promissory note, and that, being a transfer of a chose in action of a value in excess of $500, it should have been evidenced in writing.

In brief, the question to determine is whether the oral agreement is unenforceable by reason of the statute of frauds. The sale of the note was not reduced to a separate writing but transferred by written endorsement. Some of the collateral was transferred orally; the Beautiform machines by writing.

■ Collateral security held upon one obligation does not prevent its retention upon a change in the terms of the obligation if there is consent thereto by the pledgor. If the original debt is liquidated by payment in part, the collateral may be held as security for the payment of the balance. (41 Am. Jur., pp. 615-616-617, §§ 42, 43 and 44.) ■ "The parties

to the contract of pledge may, by special agreement, regulate in many respects the powers with respect to the pledged property.'' (41 Am.Jur., p. 616, § 43.) The new or the real contract as to intent may be construed by the introduction of parol evidence. The nature of a transaction must be determined from facts and not from a misuse of appellation of its character. (21 Cal.Jur., p. 294, § 6; *Stephan* v. *Lagerqvest,* 52 Cal.App. 519 [199 P. 52].)

The statute of frauds provides that an agreement is invalid unless it is in writing or is accompanied by a note or memorandum subscribed by the party charged. (Civ. Code, § 1624; Code Civ. Proc., § 1974.) The same rule applies to a chose in action if the value is $500 or upwards ''unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment.'' (Civ. Code, § 1624a; Code Civ. Proc., § 1973a.) Subdivision 3 of each section provides: ''There is an acceptance of goods within the meaning of this section when the buyer, either before or after delivery of the goods, expresses by words or conduct his assent to becoming the owner of those specific goods.''

All oral agreements of transfer of goods or choses in action of a value of $500 or over are not condemned. Under certain circumstances other evidence may be admitted in lieu of the written evidence.

 If the bank was the buyer it demonstrated its ownership after the implied delivery of the collateral by conduct indicating assent. The delivery of the note to the buyer at the request of the pledgor in accordance with the agreement is the consideration for the retention of the security; it is payment or at least part payment for the collateral. (*Adams* v. *Weaver,* 117 Cal. 42 [48 P. 972].)

It would have been an idle act to deliver physically the security to plaintiff and then have plaintiff immediately redeliver the collateral to the bank. The bank upon written request by Moseley six months later to turn part of the collateral over to him, refused categorically to do so. The bank refused to reassign the insurance policies, collected on the policies and continued, as before, with the accounts receivable. (*Kohl* v. *Lytle Creek Water & Imp. Co.,* 24 Cal.App.2d 353 [75 P.2d 71].)

 In the present case the bank is the seller and may

maintain its right to the security in question if it shows that the buyer of the note, plaintiff, actually received the goods and was not defrauded by the transaction. There is no claim that plaintiff was in fact defrauded in the sense that there was willful deceit with intent to induce him to alter his position to his injury. (Civ. Code, § 1709.) The bank did not misrepresent the transaction to plaintiff.

It may be well at this point to consider whether anyone else was defrauded. The transaction here was the sale of a claim and not a composition in bankruptcy. If the sale of the claim could be characterized as a devious, roundabout effort to defraud the creditors, we are confronted on this appeal with the fact that there are no creditors appearing in the present action.

Moseley and the Dalmo company urged the bank to enter into the transaction. ▇▇▇ A pledgee may take the property pledged as a cancellation of the debt if the debt is not paid, provided he does so at a fair market value. (*Wright* v. *Security-First Nat. Bank,* 35 Cal.App.2d 264 [95 P.2d 194].) There is no claim here of higher market value.

▇▇▇ Ordinarily a pledgor has no right to the return of pledged property until he has in some form discharged his obligation. ▇▇▇ At the time of the questioned transaction the Dalmo company was indebted to the bank in an amount in excess of the value of the collateral pledged. The bank could have applied the collateral upon the debt. Had it followed this procedure it would have sustained a loss as the collateral was insufficient to satisfy the loans. If the bank had precipitated bankruptcy proceedings it would likewise have been the loser. The plan urged by Mr. Moseley, representing himself and the Dalmo company, was the better plan for the bank, but only in the event it could retain the collateral—otherwise an indebtedness of approximately $32,000 would have been cancelled for about $8,000. It is claimed the bank made a statement to the insurance company, in the matter of the settlement of the insurance upon the death of the officer of the Dalmo company, that the $21,600 promissory note was still owing to the bank. Upon examination of the record it is discovered that this claim is based upon a communication sent to the plaintiff or its representatives, not by defendant bank but by a representative of the State Bank Examiner. There is evidence that the form letter from the bank

examiner was a "tracer" to check back on the bank's records. There also appears in the record a communication from the bank to the insurance company in which it is stated that the $8,640 had not at that time been applied to the indebtedness. Irrespective of the inference that may be drawn from that statement it was the purpose of the bank to impress upon the company that the indebtedness of the Dalmo company upon all relevant dates "exceeded the proceeds payable under the subject policy." Assuming that the records of the bank did not give a clear narrative of the disposition of the various items held as collateral, still the evidence preponderates in favor of the bank's position relative to the agreement of November, 1940. The records on the one item—the Beautiform machines—of which it was necessary to obtain an acknowledgment of ownership, showed such acknowledgment by the Dalmo company and by Moseley on the date of the agreement. Whatever may be said with reference to the information given by the bank to the insurance company, the record shows that Dalmo through Moseley requested of the insurance company "that the moneys payable under the above policy be paid to the Pacific National Bank without prejudice."

In *Thompson* v. *Mansfield*, 84 Cal.App. 560, 565 [258 P. 702], the court said: "There is nothing to prohibit a mortgagor from transferring the title to his mortgagee by a conveyance made subsequent to the mortgage, and a discharge of the debt where the transaction is fair and honest and without fraud and where no unconscionable advantage has been taken of his position by the mortgagee is a sufficient consideration for the transfer (*Watson* v. *Edwards*, 105 Cal. 70 [38 P. 527]; *Bradbury* v. *Davenport*, 120 Cal. 153 [52 P. 301]; *Garwood* v. *Wheaton*, 128 Cal. 399 [60 P. 961])." (*Graves* v. *Arizona Central Bank*, 205 Cal. 715 [272 P. 1063].) This rule may be applied to pledges.

A perusal of the entire record discloses that from a practical standpoint the trial judge equitably disposed of the controversy. We are unable to find that his decision violates any rule of law.

The judgment is affirmed.

Peters, P. J., and Knight, J., concurred.

A petition for a rehearing was denied November 15, 1944, and appellant's petition for a hearing by the Supreme Court was denied December 4, 1944. Carter, J., voted for a hearing.