[L. A. No. 23524. In Bank. Apr. 26, 1955.]

PIETRO FERRO, Respondent, v. CITIZENS NATIONAL TRUST AND SAVINGS BANK OF LOS ANGELES, Appellant.

[L. A. No. 23525. In Bank. Apr. 26, 1955.]

MONARCH WINE COMPANY, INC. (a Corporation), Respondent v. CITIZENS NATIONAL TRUST AND SAVINGS BANK OF LOS ANGELES, Appellant.

Cosgrove, Cramer, Diether & Rindge, Leonard A. Diether and Edward A. Nugent for Appellant.

Jerome Weber and Jack Altman for Respondent in No. 23524.

Bronson, Bronson & McKinnon and George K. Hartwick for Respondent in No. 23525.

TRAYNOR J.—Defendant appeals from judgments in favor of plaintiffs Ferro and Monarch in actions that were separately filed but were consolidated for purposes of trial and appeal. In these actions plaintiffs seek to recover insurance proceeds paid for their wine, which was destroyed by fire while stored with Sunnyside Winery. These proceeds came into defendant's possession, and plaintiffs contend that defendant held them in trust for the benefit of plaintiffs and that defendant breached that trust by its disposition of these proceeds and by its failure to pay them to plaintiffs.

The storage facilities of Sunnyside Winery were operated as a field warehouse by the Lawrence Warehouse Company. Of the 297,117 gallons of wine stored therein on February 8, 1950, the Lawrence Warehouse Company's inventory showed that Ferro owned 200,237 gallons, Monarch owned 83,000 gallons, Federal Wine and Liquor Company owned 6,100 gallons, Cella Vineyards owned 200 gallons, and Sunnyside owned 7,580 gallons. All of this wine and a part of Sunnyside's winery were destroyed by fire on February 8, 1950. Pursuant to contracts with the owners of the wine, Sunnyside paid the premiums on several policies of insurance covering all of the wine in storage. It also maintained insurance on its buildings and equipment. Defendant was named loss payee in all of these insurance policies. Sunnyside and its president, Felix Butte, had been clients of defendant since 1947 and defendant had occasionally made loans to Sunnyside on its wine. Defendant held the policies as collateral security for its loans and retained possession of them even when there were no loans outstanding in order to facilitate the making of a new loan to Sunnyside when the occasion for it arose.

At the time of the fire Sunnyside owed defendant $81,000 on a note secured by $25,000 in bonds and a deed of trust and a chattel mortgage on its plant and equipment. The insurance policies insured the plant and equipment for a maximum of $800,000. Defendant also held approximately $4,000 worth of trade acceptances on which Sunnyside was in default. On the same date Felix Butte, president of Sunnyside, owed defendant $23,000 on an unsecured personal note; Ferro owed defendant $52,636.67, which was secured by warehouse receipts for the 200,237 gallons of wine stored by Ferro at Sunnyside; and Monarch owed defendant $42,000 on two unsecured trade acceptances representing the purchase price of the wine stored at Sunnyside, which Monarch had purchased through an escrow conducted by defendant.

After the fire the insurance loss for all of the wine was adjusted at $136,440.49 and for the buildings and equipment at $202,000. Defendant insisted that Sunnyside, the named insured, endorse the insurance claim drafts, that defendant be the last to endorse the drafts, and that defendant collect them and control all of the proceeds received therefrom. Before any of the drafts were collected, however, unsecured creditors of Sunnyside, with claims totalling approximately $35,000, attached the monies in the hands of the insurers. On April 20, 1950, Butte arrived at defendant's place of business with the first claim draft from one of the seven wine insurers in the amount of $40,932.15. At this time a conference took place between Butte, defendant, and Ferro's attorney; Monarch was not represented. To obtain a release of the attachments, an agreement was reached whereby defendant would endorse the $40,932.15 draft, which would then be forwarded for payment of Sunnyside's unsecured creditors to the sheriff of San Francisco, who was named a payee because of the attachment. Ferro signed a written authorization for that disposition of this draft in reliance on the further agreement that defendant would collect all of the remaining proceeds of the wine insurance and the building and equipment insurance and allocate it among the several owners of the property that was destroyed by the fire and in reliance on the assurance of defendant and an insurance adjuster, who was present at the meeting, that the remaining proceeds were more than ample to cover all of the claims.

Defendant endorsed the $40,932.15 draft, and it was forwarded to the sheriff of San Francisco. Sunnyside's unsecured creditors were paid, the attachments were released, and

the balance remaining (approximately $6,000) was paid to Sunnyside. At the time of its endorsement, defendant knew that the claim draft represented proceeds of the wine insurance, and that the proceeds would be used to pay unsecured creditors of Sunnyside. It was also aware that Sunnyside owned only 7,580 gallons of the wine and that the remainder was owned by Ferro, Monarch, Federal Wine and Liquor Company, and Cella Vineyards, in the proportions indicated in the Lawrence Warehouse Company's inventory, a copy of which was given defendant at the April 20th meeting.

After the attachments were released, defendant collected all but one of the remaining claim drafts on both the wine and the building and equipment insurance. Its collections from the insurers of the wine totalled $85,275.30, and collections from the building and equipment insurers totalled $183,000. The monies thus collected from the different types of insurance were not kept separate, but were commingled, and reduced to cashier's checks drawn on defendant and payable to defendant. The only claim draft that defendant did not collect was one on which the Lawrence Warehouse Company was a payee. Lawrence refused to endorse, and defendant held it until July 27, 1950, when it forwarded the draft to Sunnyside.

By June 27, 1950, defendant's collections were substantially complete, and on that date it took $52,636.67 thereof to satisfy Ferro's debt to it. Late in June, Ferro's attorney learned that defendant had received the insurance money, but when he inquired about it, one of defendant's officers told him that defendant could not give out information about the insurance proceeds without the authorization of Butte. On July 5, 1950, defendant used insurance proceeds to satisfy all of the obligations owed to it by Butte and Sunnyside, except the $81,000 due from Sunnyside on its building loan. Monarch's obligation had come due before the insurance proceeds were collected. At defendant's insistence and in reliance on defendant's assurance that it would be reimbursed out of the insurance proceeds, Monarch paid its obligations on the due date. On July 6, 1950, defendant sent cashier's checks aggregating $60,000 to Sunnyside. Defendant retained another $60,000 in cashier's checks payable to itself as well as the $10,223.04 claim draft on which the Lawrence Warehouse Company was named as a payee. Shortly thereafter it received the final payment from the insurers in the amount

of $45,000. Neither Ferro nor Monarch had any knowledge of these transactions prior to July 6, 1950.

On July 19, 1950, Monarch wired defendant: ''We understand that the insurance moneys were collected on fire loss at Sunnyside Winery, Fresno. Amount due us on fire loss is approximately $35,000. We have been informed money is in your possession. Please be informed that we look to you for check in payment of amount due to us on fire loss.'' On this date defendant had in its possession commingled insurance proceeds in the amount of $105,000, as well as the $10,223.04 claim draft on which Lawrence Warehouse Company was a payee. On July 21, 1950, defendant used $81,000 of the proceeds in its possession to satisfy Sunnyside's building loan, and the remainder of the proceeds was delivered to Sunnyside. On July 24, 1950, defendant wrote Monarch: ''Please be advised that we do not hold any moneys representing insurance proceeds on loss by fire of wine inventory at Sunnyside Winery, Fresno, California. It is respectfully suggested that you communicate with the Sunnyside Winery and Mr. Felix Butte, Jr., to whom or to whose order such proceeds were paid.'' On July 27, 1950, defendant sent the $10,223.04 draft to Sunnyside. In November 1950 Sunnyside was declared insolvent. Neither Ferro nor Monarch was paid for their wine that was lost in the fire, and in this action they seek to hold defendant responsible for their loss.

## The Ferro Case

Ferro pledged (Civ. Code, §§ 2986, 2987) the warehouse receipts for his wine as collateral security for the payment of his debt to defendant. ■ A pledgee of collateral security for the payment of a debt is a trustee of the pledgor. (*Hudgens* v. *Chamberlain,* 161 Cal. 710, 715 [120 P. 422]; *Sparks* v. *Caldwell,* 157 Cal. 401, 403 [108 P. 276]; *Haber* v. *Brown,* 101 Cal. 445, 452 [35 P. 1035]; *Wade* v. *Markwell & Co.,* 118 Cal.App.2d 410, 426 [258 P.2d 497, 37 A.L.R.2d 1363].) ■ After the wine was destroyed, the insurance proceeds took the place of the wine (*California Ins. Co.* v. *Union Compress Co.,* 133 U.S. 387, 410 [10 S.Ct. 365, 33 L.Ed. 730]; *American Eagle Fire Ins. Co.* v. *Gayle,* 108 F.2d 116, 119; *Century Ins. Co.* v. *First Nat. Bank,* 102 F.2d 726, 728), and when those proceeds came into defendant's possession they likewise became subject to the trust established by the pledge. (*Haber* v. *Brown, supra,* 101 Cal. 445, 452; *Ponce* v. *McElvy,* 47 Cal. 154, 159-160; *Tracy* v. *Stock Assurance Bureau,* 132 Cal.App. 573, 580 [23 P.2d 41]; 21 Cal.

Jur., "Pledges," § 72; see also *Cushing* v. *Building Assn. etc. of Psychology,* 165 Cal. 731, 737-738 [134 P. 324]; *Lucas* v. *Associacao Protectora etc. Da Calif.,* 61 Cal.App.2d 344, 351-352 [143 P.2d 53].) ■■ Defendant could properly apply those proceeds to discharge the obligation secured by the pledge, but upon satisfaction thereof, it was obliged to return any surplus that remained to the pledgor, Ferro. (Civ. Code, § 3008; *Hudgens* v. *Chamberlain, supra,* 161 Cal. 710, 715; *Sparks* v. *Caldwell, supra,* 157 Cal. 401, 403; *MacDonald* v. *Pacific Nat. Bank,* 66 Cal.App.2d 357, 365 [152 P.2d 360]; see also *Baird* v. *Olsheski,* 116 Cal.App. 109, 111 [2 P.2d 493].) Its failure to do so was a breach of trust.

Defendant contends, however, that a pledge is an express contract, that it was not pleaded in Ferro's complaint, and that it would therefore be improper to allow recovery on the theory of breach of trust. Ferro did plead a common count for money had and received, but defendant contends that "such a count will not lie to enforce an express contract," citing *Barrere* v. *Somps,* 113 Cal. 97, 101 [45 P. 177, 572]. ■■ The general rule thus stated by defendant does not apply if the plaintiff owes no further performance under the contract and nothing remains to be done thereunder except the payment of money by the defendant. Payment can then be recovered under a complaint stating a common count for money had and received. (*Willett & Burr* v. *Alpert,* 181 Cal. 652, 659 [185 P. 976]; *Castagnino* v. *Balletta,* 82 Cal. 250, 257-258 [23 P. 127]; *Haggerty* v. *Warner,* 115 Cal.App. 2d 468, 474 [252 P.2d 373]; *Abbott* v. *Limited Mut. Comp. Ins. Co.,* 30 Cal.App.2d 157, 165 [85 P.2d 961]; see also *McClure* v. *Alberti,* 190 Cal. 348, 351 [212 P. 204].) The latter rule was recognized in the Barrere case, for the court there expressly pointed out that the plaintiff's contractual obligation was still executory. ■■ Ferro's obligation under the pledge contract was to pay his debt to defendant. When the insurance proceeds for Ferro's wine came into defendant's possession they became subject to the pledge, and when defendant exercised its rights under the pledge to satisfy Ferro's debt out of those proceeds nothing remained to be done but the payment by defendant of the surplus to Ferro. Ferro's complaint therefore properly stated a cause of action for the enforcement of this obligation.

■■ Defendant also contends that because Sunnyside was the named insured in the insurance policies and because the policies provided that the "Loss . . . [shall] be adjusted

with and . . . payable to the insured specifically named herein," Sunnyside, rather than Ferro and Monarch, was legally entitled to the insurance proceeds in excess of defendant's insurable interest, which was protected by the commodity loss payable endorsement that appeared on each policy. The simple answer to this contention is that the provision in the insurance policy defines only the obligation of the insurer. (*Alexander* v. *Security-First Nat. Bank,* 7 Cal.2d 718, 725, 726-727 [62 P.2d 735]; *Mutual Life Ins. Co.* v. *Henes,* 8 Cal.App.2d 306, 310-311 [47 P.2d 513].) The provision is intended to protect the insurer by permitting it to pay the named insured and to be thereafter free of claims by other persons who might have an interest in the lost property. The insurance policy did not give defendant a right to transfer the proceeds to Sunnyside, and did not prevent Sunnyside, Ferro, and defendant from expressly agreeing to a different arrangement (*ibid.*), as defendant's satisfaction from the insurance proceeds of Butte's and Sunnyside's unsecured debts clearly shows.

█ Moreover, defendant's repeated contention that it was merely acting as a collection agent for Sunnyside is rebutted by the testimony of several witnesses that defendant "insisted" that it be the last to endorse the claim draft and that it control the disposition of all of the insurance proceeds, and by Butte's testimony that defendant was not acting as a mere agent of Sunnyside but that, instead, Sunnyside was obliged to "follow the procedure set down by [defendant]" for the handling and disposition of these funds.

### The Monarch Case

The judgment in favor of Monarch must also be affirmed on the ground of breach of trust. Shortly after the fire but before any of the insurance proceeds were received, Leo Star, president of Monarch, had two conferences with one of defendant's officers who assured him that there was ample insurance to cover all of the stored wine, including that of Monarch, and that Monarch therefore "had nothing to worry about." On April 20th (the day the first claim draft for $40,932.15 came into defendant's possession) defendant was given a copy of the Lawrence Warehouse Company's inventory showing that Monarch owned 83,000 gallons of wine that had been destroyed. On the same day, and without notice to Monarch, defendant endorsed the $40,932.15 claim draft, which was a part of the proceeds of the wine insurance, and delivered it to Butte with knowledge that it

would be used to pay Sunnyside's unsecured creditors. Thereafter, defendant collected all of the proceeds of both the wine and the building and equipment insurance, with the exception of the $10,223.04 claim draft on which the Lawrence Warehouse Company was named as a payee. Defendant commingled these proceeds, and reduced them to cashier's checks drawn on itself and payable to itself. (Cf. Civ. Code, § 2236.) From these commingled proceeds it paid itself Ferro's debt, Butte's personal debt, Sunnyside's unsecured debt, and delivered $60,000 to Sunnyside. After these transactions were completed, Monarch wired defendant that it was advised that defendant was in possession of the insurance proceeds and that Monarch was looking to defendant for payment of its claim. At that time defendant had in its possession $105,000 of the commingled proceeds, in addition to the uncollected claim draft on which the Lawrence Warehouse Company was named payee. The day after receiving Monarch's telegram, defendant used $81,000 of the commingled proceeds to pay off Sunnyside's building loan. The remainder of the proceeds was ultimately forwarded to Sunnyside.

■ It is established that insurance proceeds take the place of the insured chattel, and that the named insured holds the proceeds in trust for the owner of the chattel. (*California Ins. Co.* v. *Union Congress Co.*, 133 U.S. 387, 410 [10 S.Ct. 365, 33 L.Ed. 730]; *American Eagle Fire Ins. Co.* v. *Gayle*, 108 F.2d 116, 119; *Century Ins. Co.* v. *First Nat. Bank*, 102 F.2d 726, 728; *Polley* v. *Daniels*, 238 App.Div. 181 [264 N.Y.S. 194, 197].) If these proceeds come into the possession of a third party who has notice of the trust and of the interest of the beneficial owner, he likewise holds them in trust. (*Ibid.*; *Lucas* v. *Associacao Protectora etc. Da Calif.*, 61 Cal.App.2d 344, 351-352 [143 P.2d 53]; 3 Scott on Trusts §§ 324.3, 324.4.) ■ It is clear that before defendant disposed of any of the insurance proceeds in its possession, it had actual knowledge that Monarch owned 83,000 gallons of the destroyed wine. Thereafter, defendant committed several breaches of trust by allowing proceeds of the wine insurance to be used to pay Sunnyside's unsecured creditors, by commingling the wine insurance proceeds with those of the building and equipment insurance and paying itself Butte's personal debt and Sunnyside's unsecured debt, and by delivering the remainder of the proceeds to Sunnyside without paying Monarch and without notice to Monarch that it was thus disposing of the proceeds. The fact that Sunny-

side was also obligated to pay Monarch and that Monarch might have recovered its share of the proceeds from Sunnyside (before its bankruptcy in November 1950) cannot excuse defendant's breach of its trust obligation to Monarch.

▪ Moreover, there is evidence from which it can be inferred that defendant knew at the time it delivered a part of the insurance proceeds to Sunnyside that Sunnyside's financial condition was such that the possibility of Monarch's and Ferro's claims being paid by Sunnyside was both doubtful and hazardous. For several years before the fire, defendant had a continuous course of dealings with Sunnyside and kept informed of the latter's financial condition. At the time of the fire defendant held approximately $4,000 worth of trade acceptances on which Sunnyside had defaulted. These acceptances were paid from insurance proceeds in July 1950. Defendant knew that Sunnyside urgently needed financing, and it led Sunnyside to believe that it would not call the latter's mortgage obligation of $81,000. Defendant did call that obligation and paid it off from the insurance proceeds in its possession. At that time defendant had in its possession Sunnyside's balance sheet, dated June 15, 1950, which listed the *whole* of the insurance proceeds as an asset of the corporation. In light of these facts the jury could reasonably conclude that defendant should have known that payment of Monarch's claim was rendered both doubtful and hazardous by delivery to Sunnyside of the insurance proceeds remaining after defendant had made the disbursements mentioned above.

## Instructions

A number of defendant's objections to the instructions have already been answered by the foregoing discussion. ▪ In addition, defendant contends that the jury was inadequately instructed as to what could be found to be a "wrongful" payment by defendant to Sunnyside of the share of the insurance proceeds covering Monarch's wine. Considering the instruction as a whole, and instructions 41* and

---

*"The gist and substance of Monarch's claim that a constructive trust has been established is that before the Bank endorsed the first draft of $40,000 it had promised and agreed, or by its conduct led and induced Monarch to believe, as a reasonably prudent person, that when it received the insurance proceeds, it would pay to Monarch that portion of the insurance proceeds that represented payment for Monarch's wine, and that when the Bank did receive such proceeds, it distributed them, or allowed them to be distributed to others, knowing at the time that the financial condition of Sunnyside was such that the disposal of these

42* in particular, it does not appear that the jury could have been under any misapprehension as to the trial judge's meaning in the use of the word "wrongful."

■ Defendant also contends that instructions 41 and 42 are in conflict with instruction 32.† These instructions are not necessarily inconsistent, however, for they were intended to describe the different factual situations on which defendant's liability could be predicated. Instruction 32 informed the jury that if defendant wrongfully acquired or wrongfully detained plaintiff's property, it became an involuntary trustee and held the property for plaintiff's benefit. Instructions 41 and 42 informed the jury of the consequences of lawful acquisition but wrongful disposition of plaintiff's property. There was evidence to warrant the giving of each of these instructions.

■ The jury was instructed that if Ferro "authorized or consented" or "consented and agreed" to the payment by defendant to Sunnyside he could not recover. Defendant contends that these instructions are in conflict with an earlier instruction using the words "assented to or acquiesced in" in that any reference to Ferro's "acquiescence" is omitted.

funds other than to them would probably result in Monarch's being deprived of that portion of the proceeds which represented its wine.

"In this regard you must determine what facts and circumstances have been proved, and whether the facts and circumstances found to be proved, are themselves of such a nature as to establish a trust, the breach of which would entitle Monarch to judgment in the action.

"The question of liability must be determined by what happened before the Bank disbursed the money. Whatever conversations took place or events occurred after the money passed from the hands of the Bank is not to be considered by you in determining the question of liability of the Bank."

*"In order for Monarch to recover it must be established by a preponderance of the evidence:

"The Bank knew of the ownership of Monarch in the wine destroyed:

"The Bank agreed to pay Monarch, or led or induced Monarch to believe that it would pay Monarch, out of insurance proceeds that came into its possession, the insured value of Monarch's wine.

"That the Bank thereafter paid, or allowed to be paid, to others all of the insurance proceeds, except the amount of Ferro's indebtedness to it, knowing at the time, or having such knowledge that, as a reasonably prudent person it should have known, that by such action Monarch would not be paid for its wine, or that such payment would be doubtful and hazardous.

†"You are instructed that a person who wrongfully detains the property of another, or a person who gains property by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act is, unless he has some other and better right thereto, an involuntary trustee of the property gained, for the benefit of the person who would otherwise have had it."

414

The instructions were not inconsistent, if the word "acquiescence" in the earlier instruction referred to laches. ██ If "acquiescence" was intended to mean "passive submission or acceptance" (see Webster's New Internat. Dict. [2d ed. 1942], p. 23), defendant was not prejudiced thereby since a mere acquiescence is not a defense to an action against a trustee for breach of trust. (Rest., Trusts, § 216(1), comment *a*; 2 Scott on Trusts 1151.)

██ Defendant contends that it was prejudicial error for the court to refuse to give its requested instruction that the jury must "state in [its] verdict upon which, if any, of the respective causes of action you believe any plaintiff is entitled to recover judgment against defendant. . . ." Both Ferro and Monarch stated alternative theories of recovery in three separate counts of their complaints. The instruction requested by defendant in effect asked for special verdicts on each of the six counts. The direction of special verdicts is within the discretion of the trial judge. (Code Civ. Proc., § 625; *House Grain Co.* v. *Finerman & Sons,* 116 Cal.App.2d 485, 498 [253 P.2d 1034]; *Lloyd* v. *Kleefisch,* 48 Cal.App.2d 408, 417 [120 P.2d 97].) Nothing appears herein to indicate that the refusal to give defendant's requested instruction was an abuse of discretion.

██ Defendant contends that the following instruction on the measure of damages was erroneous and prejudicial:

"If you should return a verdict for one or more of the plaintiffs against the defendant, you shall determine the amount of money the particular plaintiff is entitled to, and return a verdict for that amount, together with interest from the 6th day of July, 1950.

"Plaintiff Ferro seeks to recover on the basis of 14 cents a gallon for the wine destroyed by the fire.*

"Plaintiffs [*sic*] Monarch seeks to recover the amount paid per gallon by the insurance companies for its wine stored in the Sunnyside Warehouse."

---

*This prayer was based on the theory, which was presented at the trial, that Ferro's wine was worth 39 cents a gallon and that his debt to defendant was the equivalent of 25 cents a gallon. Since that debt had been paid he contended that he was entitled to the remaining 14 cents. This method of computation was the result of a practice established before the fire. Ferro had agreed to sell his wine to Sunnyside in accordance with the latter's needs from time to time. As Sunnyside withdrew irregular lots and appropriated them to its own use, it would send a check for the amount withdrawn, computed at 39 cents a gallon, to defendant. Defendant would retain the equivalent of 25 cents a gallon and apply it to Ferro's obligation to defendant. The equivalent of 14 cents a gallon would then be forwarded by defendant to Ferro.

The instruction was correct. Ferro's prayer for $29,174.32 was based on the assumption that he owned 208,388 gallons of wine. Evidence was introduced to show that normal shrinkage had reduced Ferro's wine to 200,237 gallons. The jury accepted this evidence and multiplied that figure by 39 cents. From that total ($78,092.43) it subtracted the amount of Ferro's debt to defendant ($52,636.67) and returned a verdict for the remainder, $25,455.76. Monarch's loss was found to be the amount that Monarch paid for the destroyed wine, which was less than the amount of insurance proceeds attributable to that wine. Thus, the verdicts for both plaintiffs were less than those that could have been returned under the court's instructions.

 Defendant contends, however, that it "received" only $85,275.30 of the total wine insurance proceeds of $136,440.49, and thus that plaintiffs are at most entitled to a share of that sum equivalent to the proportion that their wine bore to the total amount of the destroyed wine and, in Ferro's case, less the amount of his debt to defendant. Such a computation would result in a verdict for Ferro in the amount of $4,830.35, and for Monarch in the amount of $23,821.74. This argument is based on the assumption that it is proper to exclude from the computation the $40,932.15 draft that was used to pay Sunnyside's attaching creditors and the $10,233.04 draft on which the Lawrence Warehouse Company was named a payee. These drafts cannot be excluded. Defendant had these drafts as well as the remainder of the proceeds within its possession and control. It delivered the $10,233.04 draft to Sunnyside without notice to either plaintiff, and Ferro's agreement to the use of the $40,932.15 draft to pay Sunnyside's creditors was made in reliance on defendant's assurance that he would be paid from the remaining proceeds. Defendant had knowledge of each plaintiff's interest in the wine insurance proceeds and it assured each of them that those proceeds would be adequate to pay their claims. Defendant was a trustee of those funds and was obligated to protect plaintiffs' interests therein.

 It is contended that the court's instruction that plaintiffs were entitled to interest from July 6, 1950, was error and that plaintiffs are entitled to interest only from the date of judgment. Section 3287 of the Civil Code provides that "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular

day, is entitled also to recover interest thereon from that day. . . ." (See *Lineman* v. *Schmid*, 32 Cal.2d 204, 209-213 [195 P.2d 408, 4 A.L.R.2d 1380].) Plaintiffs' damages were "capable of being made certain" on July 6, 1950, except for the dispute over the amount of shrinkage on Ferro's wine. There was no question but that Ferro was entitled to recover for 200,237 gallons of wine, and the dispute over the amount of shrinkage from the original 208,388 gallons cannot affect the certainty of that figure. Since the jury limited recovery to 200,237 gallons, there was no error in allowing interest.

The judgments are affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Schauer, J., and Spence, J., concurred.