**MICHIGAN FIRE AND MARINE IN-SURANCE COMPANY**

**v.**

**GENIE CRAFT CORPORATION et al.**
**Civ. No. 11789.**

United States District Court
D. Maryland.
Jan. 9, 1964.

James M. Earnest and James D. Newton, Washington, D. C., and M. Peter

Moser, Baltimore, Md., for Union Trust Co. of the District of Columbia.

Mitchell Stevan, Baltimore, Md. (Louis J. Sagner, Baltimore, Md., on the brief), for the Trustee in Bankruptcy of Genie Craft Corp.

THOMSEN, Chief Judge.

In this interpleader case, brought under 28 U.S.C.A. § 1335, the Court has already ruled on many claims and contentions with respect to the $73,261.32 proceeds of a fire insurance policy. See D.C., 183 F.Supp. 533 and D.C., 195 F. Supp. 222. A final hearing on the claim of Union Trust Company of the District of Columbia (the Bank) [1] was postponed until a related case in the District was concluded. See Stevan v. Union Trust Company, D.C.Cir., 316 F.2d 687 (1963). At that hearing, additional evidence was offered by the Bank and by the Trustee in Bankruptcy for Genie Craft Corporation, which was the insured named in the policy.

The Trustee contends that an assignment to the Bank by Genie Craft of part of its claim against the Insurance Company, made on January 3, 1958, several days after the fire and within four months of bankruptcy, at a time when the Bank knew or had reasonable cause to believe that Genie Craft was insolvent, was a preferential transfer, which may be avoided by the Trustee since it was given for an antecedent debt. Bankruptcy Act, sec. 60, 11 U.S.C.A. § 96.

The Bank does not admit that it had reasonable cause to believe that Genie Craft was insolvent at the time of the assignment, but its principal contention is that it already had a lien on the proceeds of the policy by operation of law, as a result of a loan which it had made to Genie Craft on August 3, 1957, secured by certain warehouse receipts for merchandise deposited in a field warehouse by Genie Craft, despite the fact that the Bank had not been named a loss payee in the policy, which insured the

1. Union Trust Company is the successor to Munsey Trust Company, of Washington; they will be referred to herein collectively as "the Bank".

warehoused merchandise along with other goods. Genie Craft was the named insured at the time of the fire.

Other points raised by the Bank and by the Trustee, respectively, will also be considered.

### Findings of Fact

1. Three important dates must be kept in mind. Genie Craft became insolvent on December 15, 1957. The fire occurred December 26, 1957. Genie Craft was adjudicated bankrupt on February 4, 1958.

2. Genie Craft had been engaged in the retail sale of cooking utensils, encyclopedias, sewing machines and other household appliances in Maryland, Virginia and the District of Columbia. It sold such merchandise under written time contracts providing for a small down payment and a promissory note for the balance, payable in weekly instalments over a period of more than a year.

3. On or about June 1, 1956, the Bank agreed to extend credit to Genie Craft, to be secured in part by the pledge and delivery to the Bank of purchase contracts and notes and in part by certificates of deposit in the aggregate amount of $95,000 issued to various individuals who made time deposits in the Bank. With the exception of William B. Pinson, who deposited $20,000, and Edward A. Terres, who deposited $6,000, the depositors assigned their residual rights in the deposits to Genie Craft. Because of the expense and difficulty of collecting the balances due on the contracts and notes, the Bank placed a percentage limit on such loans.

4. On April 18, 1957, Genie Craft executed and delivered to the Bank a pledge agreement under which it pledged to the Bank all its property as security for all outstanding loans, discounts, financial credits and accommodations theretofore extended or thereafter to be extended to Genie Craft by the Bank.

5. By August 1, 1957, the limit set by the Bank on the loans referred to in Finding 3, above, had been reached, and the Bank declined to make a further loan of $22,500, which Genie Craft had requested, unless it was given additional collateral security. Accordingly, on August 2, 1957, Genie Craft pledged as security for a $22,500 note which it executed and delivered on that day, warehouse receipts of Lawrence Warehouse Company, Nos. 122926–40, dated August 1, 1957, issued to the Bank, showing that merchandise valued at a total of $37,997.09 had been placed by Genie Craft in a field warehouse at 11 North Howard Street, Baltimore, Maryland, on the top floor of the premises occupied by Genie Craft in Baltimore. The warehouse receipts stated on their face: "not insured".

6. On February 1, 1957, Michigan Fire and Marine Insurance Company had issued a policy of insurance insuring "Michael A. and Ada T. Lombardi, t/a Home Sewing Machine Company (co-ownership) and Lawrence Warehouse Company, and General Electric Credit Corporation, as their interests may appear", against loss and damage by fire to certain personal property located at Nos. 9 and 11–13 North Howard Street, and 327 West Baltimore Street, both in Baltimore, Maryland.

7. Customarily, when a bank makes a loan secured by warehouse receipts as collateral it obtains a certificate of insurance showing that the bank has been made a loss payee under the fire policy. When the Bank made the $22,500 loan on August 2, 1957, its officers knew of that custom, but had no express understanding with Genie Craft that the Bank would be made a loss payee. A few days after the loan was made, the Bank learned that Lawrence Warehouse Company was a loss payee of the existing policy, which covered the merchandise in the warehouse along with other goods of Genie Craft. The Bank also knew that the warehouse company was holding some of the merchandise for General Electric Credit Corporation. The Bank took no action to see that it was made a loss payee, beyond asking one of Genie Craft's officers to obtain a certificate of

insurance, which the officer promised to do, without specifying what the certificate would show. No certificate was ever furnished.

8. By an endorsement effective October 21, 1957, the name of the insured under the policy was changed from "Michael A. and Ada T. Lombardi, t/a Home Sewing Machine Company (co-ownership) and Lawrence Warehouse Company, and General Electric Credit Corporation, as their interests may appear", to "Genie Craft Corporation, Home Company Division". No loss payee clause was added making the warehouse company or anyone else a loss payee. At the time of the fire there was no loss payee clause.

9. In September and October 1957 Genie Craft made a public offering of $200,000 of its stock, of which only $15,000 to $20,000 was sold. The failure to sell more stock gave the Bank considerable concern. In October 1957 the Bank received a statement from the warehouse company showing that Genie Craft's warehouse charges for prior months were past due. In November 1957 the Bank knew that efforts had been made to sell the business to the Dalton Finance Company in order to salvage as much as possible but that Dalton was unwilling to take it over. On December 5, 1957, after refusing to make any further loans to Genie Craft, the Bank loaned $25,000 to five of the officers and directors of Genie Craft, who immediately deposited the funds to Genie Craft's account in the Bank. This entry was dated November 30, 1957, on Genie Craft's bank deposit book and on its cash receipts ledger to make it appear that the account was not overdrawn. Later in December 1957 the Bank was informed that Genie Craft did not have enough money to keep its collection force going. The Bank knew that if the collections were not made, the accounts of Genie Craft which the Bank held as collateral for its loans would become stale and lose much of their value.

10. Genie Craft became insolvent on December 15, 1957, and remained so until it was adjudicated bankrupt on February 4, 1958.

11. On December 26, 1957, a fire occurred at 11 North Howard Street which destroyed substantially all the goods covered by the pledged warehouse receipts, as well as other property of Genie Craft. Before the fire, a portion of the goods represented by the warehouse receipts pledged to the Bank had been released to Genie Craft, with the consent of the Bank; the value of the remaining goods covered by the pledged receipts was $30,050.91.

The Bank learned of the fire on December 27, 1957, and on or before that day the Bank knew or had reasonable cause to believe that Genie Craft was insolvent.

13. On December 31, 1957, Genie Craft executed and tendered to the Bank a written assignment of the first $22,500 payable by the insurance company on account of the fire loss. The assignment was intended to replace the security which the Bank had lost by reason of the fire. The form of the assignment was not acceptable to the Bank, so on January 3, 1958, Genie Craft executed and delivered to the Bank another assignment, which recited the Bank's version of the pledge transactions and stated that, inadvertently, the Bank had not been made a loss payee under the policy. The Bank mailed the second assignment to the Springfield Fire and Marine Group, and Empire State Insurance Company, which had reinsured Michigan Fire, accepted the assignment on January 14, 1958. For details, see 195 F. Supp. at 225, n. 1, and 226. See also discussion in 183 F.Supp. at 535, 536. It is now conceded that Empire acted as agent of Michigan in accepting the assignment.

14. Each of the assignments referred to in Finding 13, given by Genie Craft to the Bank, was (1) a transfer of its property, (2) to or for the benefit of the Bank, its creditor, (3) for and on account of an antecedent debt, (4) at a time when Genie Craft was insolvent, (5) within four months of bankruptcy,

and (6) which would enable the Bank to obtain a greater percentage of its debt than some other creditor of the same class.

15. On January 24, 1958, the Bank sold the accounts receivable of Genie Craft which had been pledged to it. See Finding 3. After applying against Genie Craft's loans (1) the proceeds of that sale and (2) the security deposits in which residual rights had been assigned to Genie Craft, the balance due the Bank on the Genie Craft loans was $25,866.24, which has not been paid to the Bank.

16. Against this balance the Bank still holds as security the proceeds of the time certificates of deposit made by Pinson ($20,000) and Terres ($6,000) and $478.36 belonging to Genie Craft, $26,478.36 in all. The Bank decided not to apply the proceeds of these certificates to the indebtedness of Genie Craft. Instead, the certificates of deposit of Pinson and Terres were cashed and are now held by the Bank in a special account entitled "Genie Craft Corp. Loan Account". There is no agreement between the Bank and Pinson and Terres with respect to what will happen to their security deposits of $26,000 held by the Bank in the event the Bank's claim for $22,500 in this interpleader case is unsuccessful.[2]

### Conclusions of Law and Discussion

■ A. The pledge of the warehouse receipts was in legal effect a perfected, choate pledge of the merchandise covered by the warehouse receipts issued to the Bank. 56 Am.Jur. (Warehouses § 72) p. 355; In re P. J. Sullivan Co., S.D.N.Y., 247 F. 139, 155, aff'd, 2 Cir., 254 F. 660 (1918). Cf. In re Spanish American Cork Products Co., 4 Cir., 2 F.2d 203, 204 (1924), cert. den. Western Nat. Bank of Baltimore v. Chapman, 266 U.S. 634, 45 S.Ct. 225, 69 L.Ed. 479; and Barry v. Lawrence Warehouse Co., 9 Cir., 190 F. 2d 433, 435 (1951).

■ B. The lien created by that pledge was superior to the federal tax lien assessed against Genie Craft on November 22, 1957, and recorded in the District of Columbia on February 11, 1958. United States v. Pioneer American Insurance Co., 374 U.S. 84, 87, 83 S.Ct. 1651, 10 L.Ed.2d 770 et seq. (1963).

In any event, a prior tax lien would merely take precedence over junior liens, and would not enable the Trustee in Bankruptcy to avoid otherwise valid and choate junior liens. See discussion in 183 F.Supp. at 536, 537. The validity of that ruling is not altered by later cases cited by the Trustee.

■ C. The lien created by the pledge, however, did not become an equitable lien on the proceeds to the policy of insurance enforceable against the Trustee in Bankruptcy of Genie Craft. Sec. 60, sub. a(6) of the Bankruptcy Act, as amended in 1950, 11 U.S. C.A. § 96, sub. a(6), discussed below. For a full discussion of the 1938 and 1950 amendments, see Collier on Bankruptcy, 14th ed., Vol. 3, par. 60.50, p. 972 et seq.

The authorities cited by the Bank indicate that if bankruptcy had not intervened, the lien would ordinarily be considered to have been transferred to the proceeds of the policy as an equitable lien. California Ins. Co. v. Union Compress Co., 133 U.S. 387, 10 S.Ct. 365, 33 L.Ed. 730 (1890); Ferro v. Citizens National Trust & Savings Bank, 44 Cal. 2d 401, 282 P.2d 849, 852–854 (1955). And if the proceeds had come into the hands of the warehouse company as a loss payee, it would have held the proceeds in trust for the Bank, as it had held the merchandise. Century Insurance Company v. First Nat. Bank, 5 Cir., 102 F.2d 726, 728–729 (1939); American Eagle Fire Ins. Co. v. Gayle, 6 Cir., 108 F.2d 116, 119 (1939); In re Podolsky, 3 Cir., 115 F.2d 965, 967 (1940); and United States v. Globe & Rutgers Fire

---

2. Counsel appearing for the Bank were retained by Pinson and Terres, with whom they have a fee arrangement. Counsel have no arrangement concerning either fee or costs with the Bank.

Ins. Co., N.D.Tex., 104 F.Supp. 632, 635 (1952), aff'd, 5 Cir., 202 F.2d 696 (1953).

■ But since the 1938 and 1950 amendments to Sec. 60 of the Bankruptcy Act, such an *equitable* lien as the Bank contends that it has on the proceeds of the insurance policy cannot be enforced against the Trustee in Bankruptcy, where its enforcement would result in a preference to the Bank. Sec. 60, sub. a(6), 11 U.S.C.A. § 96, sub. a(6), now states: "The recognition of equitable liens where available means of perfecting legal liens have not been employed is hereby declared to be contrary to the policy of this section."

Cases decided since 1950 indicate that the statute means what it says. Eberly v. Dudley, 9 Cir., 314 F.2d 8, 14 (1962); Republic National Bank of Dallas v. Vial, 5 Cir., 232 F.2d 785 (1956); Cumberland Portland Cement Co. v. R. F. C., D.C., 140 F.Supp. 739, 753 (1953), aff'd sub nom. Ralph Rogers & Co. v. R. F. C., 6 Cir., 232 F.2d 930. So does the legislative history. U. S. Code & Cong. Serv., 81st Cong., 2d Sess., 1950, Vol. 2, pp. 1985, 1989.

The decisions which have allowed equitable liens on the ground that no means of perfecting legal liens were available only serve to emphasize the rule. In re William P. Bray Co., D. Conn., 127 F.Supp. 627 (1954); Danais v. M. De Matteo Const. Co., D.N.H., 102 F.Supp. 874 (1952). Joseph F. Hughes Co. v. Machen, 4 Cir., 164 F.2d 983 (1947), dealt with a right of setoff, an entirely different matter.

In the instant case the Bank had "available means" of perfecting a legal lien—by requiring that the Bank be made a loss payee under the policy. Through carelessness on the part of the Bank those means were not employed. See Findings of Facts Nos. 7 and 8. Whether the failure of Genie Craft to have the Bank made a loss payee was inadvertent or not, is unimportant. There were means available to the Bank to secure a legal lien on the proceeds before it knew of the insolvency of Genie Craft.

No doubt, as the Bank argues,[3] the assignments prepared after the fire were given to replace the security which the Bank had lost. But they were given only one month before bankruptcy, after the fire, when the Bank knew Genie Craft was insolvent.

The cases decided before 1938, cited by the Bank, are no longer controlling. Collier, op. cit., par. 60.50, at p. 975 et seq.

■ D. The assignments dated December 31, 1957, and January 3, 1958, given by Genie Craft to the Bank, were preferential transfers made within four months of bankruptcy, at a time when the Bank knew or was reasonably chargeable with knowledge that Genie Craft was insolvent, and are therefore voidable by the Trustee in Bankruptcy.

All the elements of a voidable preference exist. The Court is satisfied that the Bank not only had reasonable cause to believe that Genie Craft was insolvent on December 29, 1957, and January 3, 1958, but that it actually knew Genie Craft was insolvent not later than December 27, 1957, and probably some weeks earlier. The Bank's principal argument, that the assignment was not given "for or on account of antecedent debt", is answered by the facts and by the discussion under Conclusion C, above.

E. The Trustee contends that Pinson and Terres are the real parties in interest, not the Bank. The evidence shows that the Bank still holds the deposits of Pinson and Terres in the amount of $26,000, as collateral security for the balance of $25,866.24 due the Bank from Genie Craft, for which the Bank has a general claim against Genie Craft's bankrupt estate. If the Bank applies the deposits to the satisfaction of the claim, Pinson and Terres would take over the Bank's claim. Equitably, one general claim for the balance due the Bank is allowable. If the Court had

3. Brief, pp. 17, 18.

held that the assignment was not a voidable preference and that the Bank had a lien on the proceeds of the policy as collateral security for its debt, a question of marshaling might have arisen, which does not now exist.

F. The Bank's alternative argument, based on the broad pledge agreement of April 18, 1957, see Finding of Fact No. 4, is answered by the 1938 and 1950 amendments to Sec. 60, 11 U.S.C.A. § 96, discussed under Conclusion C, above.

Settle order within ten days.